FILED

MAR 0 1 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AO 91 (Rev. 11/11) Criminal Complaint

AUSA Sean Franzblau (312) 353-5305
AUSA Grayson S. Walker (312) 697-4091

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NUMBER: 19CR 192 |
| v. | |
| ROMMELL KELLOGG, also known as "Rod," and COREY JOHNSON, also known as "Coco" | **UNDER SEAL** MAGISTRATE JUDGE VALDEZ |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From no later than in or around 2012 and continuing until at least in or around 2018, at Harvey, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendants violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 371 | Conspiracy to commit an offense against the United States |

This criminal complaint is based upon these facts:

__X__ Continued on the attached sheet.

*Nijika Rustagi*

NIJIKA RUSTAGI
Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my presence.

Date: <u>March 1, 2019</u>

_____
*Judge's signature*

City and state: <u>Chicago, Illinois</u>

<u>MARIA VALDEZ, U.S. Magistrate Judge</u>
*Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

ss

## **AFFIDAVIT**

I, NIJIKA RUSTAGI, being duly sworn, state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since December 2017. My current responsibilities include the investigation of public corruption and violent crime offenses, including extortion and bribery. As part of my duties, I have been involved in various types of electronic surveillance, the preparation and execution of search warrants, as well as in the debriefing of defendants, witnesses, informants and others who have knowledge of criminal activities. Through my work as an FBI Special Agent, I have become familiar with the means and methods of those engaged in corruption-related offenses.

2.     This affidavit is submitted in support of a criminal complaint alleging that ROMMELL KELLOGG, also known as "Rod," COREY JOHNSON, also known as "Coco," and others known and unknown, have knowingly conspired to commit an offense against the United States, that is, to use and cause to be used a facility in interstate commerce with the intent to promote, manage, and carry on, and to facilitate the promotion, management, and carrying on, of an unlawful activity, namely, extortion—specifically, theft in violation of 720 ILCS 5/16-1, and intimidation, in violation of 720 ILCS 5/12-6—and thereafter, to perform and attempt to perform an act of promotion, management, and carrying on, and facilitation of the

2

promotion, management, and carrying on, of the unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3), all in violation of Title 18, United States Code, Section 371.[1] Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offense alleged in the complaint.

3.     The information contained in this Affidavit is based on my participation in this investigation; agents' review of court-authorized interceptions of wire communications; witness interviews; review of records obtained from various parties; discussions with other law enforcement agents with knowledge of this investigation; my training and experience; and the training and experience of other law enforcement officers with whom I have consulted. Since this Affidavit is being submitted for the limited purpose of establishing probable cause as set forth herein, I have not included each and every fact known to me concerning this investigation.

---

[1]     Illinois' theft statute, 720 ILCS 5/16-1, provides in pertinent part:

   (a) A person commits theft when he or she knowingly:
   … (3) Obtains by threat control over property of the owner.

   Illinois' intimidation statute, 720 ILCS 5/12-6, provides in pertinent part:

   (a)     A person commits intimidation when, with intent to cause another to perform or to omit the performance of any act, he or she communicates to another, directly or indirectly by any means, a threat to perform without lawful authority any of the following acts:
   … (6) Take action as a public official against anyone or anything, or withhold official action, or cause such action or withholding[.]

4.     Reference is made to lawfully recorded conversations in this affidavit. In certain instances, these conversations are summarized and placed in context. My understanding of these conversations (which often appears in brackets) is aided by the content and context of the conversations, my familiarity with the facts and circumstances of this investigation, my experience as a law enforcement officer, the experience of other law enforcement agents and officers in this investigation, my discussions with other law enforcement officers, and other evidence developed during the course of this investigation.  The times listed for recorded conversations are approximate.  Further, summaries of the recorded conversations herein do not represent finalized transcripts and may not represent the entire conversation that occurred between the identified individuals.

## I.     **Summary of Probable Cause**

5.     There is probable cause to believe that ROMMELL KELLOGG, COREY JOHNSON, and others known and unknown have conspired to commit an offense against the United States, that is, to use and cause to be used a facility in interstate commerce with the intent to promote, manage, and carry on extortion in violation of Illinois State law.  As part of the conspiracy, KELLOGG and JOHNSON have extracted regular extortion payments from Business 1, a club located in Harvey, Illinois, based on threats that officials of the City of Harvey would shut down Business 1 if the payments were not made.

6.     In October 2017, a long-time manager of Business 1 ("CS-3") told agents that, for the past several years, at the direction of the ownership of Business 1, CS-3

had made regular payments to JOHNSON approximately every two weeks. According to CS-3, JOHNSON delivered the payments to City officials, in exchange for the City of Harvey allowing Business 1 to operate, which included knowingly allowing acts of prostitution to occur onsite. According to CS-3, the owner of Business 1 had explained to CS-3 that, if CS-3 failed to make the payments, Individual B, who was a City of Harvey police officer, would use his/her police powers to shut down Business 1.

7.     Between October 2017 and May 2018, at the direction of law enforcement, CS-3 made multiple controlled payments to JOHNSON that confirmed the information provided by CS-3. The recordings made by CS-3, as well as court-authorized interceptions of wire communications, also confirmed that JOHNSON collected the payments from Business 1 on behalf of others, including but not limited to KELLOGG. For example, in January 2018, CS-3 met directly with KELLOGG, who confirmed he had enlisted JOHNSON for the purpose of collecting payments from Business 1. Furthermore, in May 2018, CS-3 again met with KELLOGG and delivered a $3,000 payment directly to KELLOGG.

## II.     Table of Individuals and Businesses Discussed

8.     Throughout this affidavit, I discuss several individuals and businesses related to the extortion scheme. Below is a summary table:

| CS-3 | Cooperating source; manager of Business 1. |
|------|--------------------------------------------|
| Individual A | Mayor of the City of Harvey; brother of ROMMELL KELLOGG and |

|  | Individual B; cousin of COREY JOHNSON. |
|---|---|
| Individual B | City of Harvey police officer and *de facto* head of the City's Building and Planning Department; brother of ROMMELL KELLOGG and Individual A; cousin of COREY JOHNSON. |
| Individual C | City of Harvey police officer. |
| Individual 1 | Original operator of Businesses 1 and 2; Individual 2's spouse; Individual 4's parent. |
| Individual 2 | Owner of Businesses 1 and 2; Individual 1's spouse; Individual 4's parent. |
| Individual 4 | Later operator of Businesses 1 and 2 (after Individual 1's death); Individual 1 and 2's child. |
| Business 1 | Club in Harvey owned/operated by Individuals 1, 2, and 4. |
| Business 2 | Restaurant in Harvey across the street from Business 1, owned/operated by Individuals 1, 2, and 4. |

## III.   Facts Establishing Probable Cause

### A.   Background

9.      Business 1 is a club located in Harvey, Illinois.  Based on witness interviews, consensual recordings, Illinois Secretary of State records, and relevant court and tax filings, I know that Individual 1 operated Business 1 and Individual 2,

6

Individual 1's spouse, held an ownership interest in Business 1. Individual 1 died in or around 2008, and thereafter, Individual 1's child, Individual 4, assumed responsibility for the day-to-day operations of Business 1. Based on a review of relevant court filings and tax and trust records, during all periods discussed in this Affidavit, Business 1 and the property on which it was located were held in a private trust for which Individual 2 was the sole beneficiary. Based on agents' discussions with Business 1's former accountant, and a review of financial records, during the period discussed in this Affidavit, Business 1 made rental payments to Individual 2, and nobody else.

10.     Based on agents' interview of Individual 2, as well as an independent review of relevant tax, property, and Secretary of State records, it appears that neither the City of Harvey, nor any of the conspirators discussed in this affidavit have ever held a legitimate ownership interest in Business 1, or the property on which the business is located.

11.     Between 2015 and 2017, federal and state law enforcement authorities investigated allegations that commercial sex acts were regularly performed at Business 1. Based on the investigation, including undercover operations, trash pulls, and witness interviews, law enforcement determined that Business 1 operated as a strip club and also maintained an area with several private booths or stalls where female dancers performed commercial sex acts in exchange for money. For example, between approximately March 2015 and October 2017, undercover law enforcement officers posing as customers went to Business 1 approximately five times. On each

occasion, one or more female dancers at Business 1 offered to perform sex acts on a male undercover agent/officer in the back VIP area in exchange for money. In August 2016, an undercover agent accepted a dancer's offer to perform a private lap dance in the back VIP area, where the undercover agent observed a different dancer having sexual intercourse with a customer in another stall. In addition, between approximately June 2016 and September 2017, law enforcement conducted approximately four trash pulls from the dumpster located behind Business 1 and recovered items—such as used condoms, condom wrappers, and lubricants— indicating that sexual activity was regularly occurring onsite at Business 1.

12. Business 1 engaged in interstate commerce. Specifically, based on information produced by two business that supplied Business 1 with alcoholic and non-alcoholic beverages during the time frame of the events discussed herein, Business 1 customarily purchased alcohol produced outside the State of Illinois, and non-alcoholic beverages supplied by an out-of-State vendor located in Hammond, Indiana.

13. Based on court-authorized wire interceptions and witness interviews, I know that ROMMELL KELLOGG is the brother of Individual A, who is the mayor of the City of Harvey, and KELLOGG is also the brother of Individual B, who is employed as a police personnel officer by the City of Harvey, and who also acts as the *de facto* head of the City's Building and Planning Department. The Building and Planning Department is responsible for, among other things, conducting inspections of businesses operating in Harvey to ensure the buildings they use comply with the

municipal code. Based on court-authorized wire interceptions, witness interviews, and my review of Harvey payroll records, I know that KELLOGG does not hold any public office or public employment, and therefore does not have any legal authority to regulate or control the operations of commercial properties and businesses within the City of Harvey. Nor does KELLOGG have any legal authority to collect payments or fees from any such properties or businesses on behalf of the City of Harvey.

14. Based on witness interviews and wire interceptions, I know that COREY JOHNSON is the cousin of KELLOGG, Individual A, and Individual B. Based on wire interceptions, witness interviews, and my review of Harvey payroll records, I know that JOHNSON does not hold any public office or public employment, and therefore does not have any legal authority to regulate or control the operations of commercial properties and businesses within the City of Harvey. Nor does JOHNSON have any legal authority to collect payments or fees from any such properties or businesses on behalf of the City of Harvey.

15. On or about December 7, 2017, Chief Judge Ruben Castillo of the United States District Court for the Northern District of Illinois entered an order authorizing the interception of wire communications over telephone number XXX-XXX-6151,

used by COREY JOHNSON ("JOHNSON phone"),[2] and telephone number XXX-XXX-1910, used by Individual B ("Individual B phone").[3]

16. On or about January 16, 2018, Chief Judge Ruben Castillo entered an order authorizing the renewed interception of wire and electronic communications over Individual B phone, and the initial interception of wire communications over telephone number XXX-XXX-0411, used by ROMMELL KELLOGG ("KELLOGG phone").[4]

---

[2] JOHNSON was identified as the user of JOHNSON phone as follows: First, according to CS-3, JOHNSON is the user of JOHNSON phone. Second, as explained herein, after CS-3 delivered a $1,500 payment to JOHNSON on or about October 6, 2017, CS-3 received a message from JOHNSON phone that stated, "Okay," which was a pre-planned message that JOHNSON told CS-3 he would send him/her after delivering the payment to City officials. Third, during the investigation a cooperating source met with JOHNSON several times in person, and these meetings were video and/or audio recorded. JOHNSON was identified in some of the video recordings based on a comparison of the video to a photograph of JOHNSON's Illinois driver's license. JOHNSON was also identified based on physical surveillance of some of his meetings with CS-3. Fourth, in several intercepted and consensually recorded calls involving JOHNSON phone, speakers refer to the user of JOHNSON phone as "Corey" or "Co Co," which I believe is a nickname for "Corey," and the user responds appropriately.

[3] Individual B was identified as the user of Individual B phone as follows: First, based on service provider records, Individual B phone was registered to the City of Harvey during all periods of interception set forth in this affidavit, and Individual B was a City of Harvey employee during the same period. Second, during the interception of Individual B phone, the user of the phone regularly referred to himself as Individual B's last name, and was regularly addressed as a shortened form of Individual B's first name, as well as by Individual B's last name, and responded appropriately. Third, during the investigation, at least two cooperating sources, including CS-3, have met with Individual B in person, and several of these meetings have been video and/or audio recorded. Individual B was identified in some of the video recordings based on a comparison of the video to a photograph of Individual B's Illinois driver's license. I have compared the voice of Individual B in the video and audio recordings from in-person meetings to the voice of the user of Individual B phone, and recognize the voices to be the same.

[4] KELLOGG was identified as the user of KELLOGG phone as follows: First, based on service provide records, Rommell Kellogg was the registered subscriber of KELLOGG phone during all periods discussed in this affidavit. Second, on January 23, 2018, CS-3 met with KELLOGG in person and KELLOGG provided CS-3 with his personal

**B. According to CS-3, Individual 1 Made Payments to Individual A in Exchange for the City Allowing Business 1 to Operate.**

17. On or about October 3, 2017, federal and state law enforcement executed a search warrant at Business 1 for evidence and instrumentalities concerning sex trafficking and tax crimes. At or around the time agents executed the search warrant, law enforcement interviewed CS-3, a manager at Business 1, at his/her home. CS-3 agreed to cooperate during his/her initial interview, and during that interview and several subsequent interviews, CS-3 provided agents with the following information regarding a long-running extortion scheme involving City of Harvey officials, their family members, and Business 1.[5]

---

phone number, which was the number for KELLOGG phone. Third, during the investigation a cooperating source met with KELLOGG several times in person, and these meetings were video and/or audio recorded. KELLOGG was identified in some of the video recordings based on a comparison of the video to a photograph of KELLOGG's Illinois driver's license. I have compared the voice of KELLOGG in the video and audio recordings from in-person meetings to the voice of the user of KELLOGG phone, and recognize the voices to be the same. Fourth, in lawfully intercepted and/or recorded phone calls, the user of KELLOGG phone is regularly addressed as "Rod" or "Rom," which I believe are nicknames for "Rommell,"and responds appropriately.

[5] CS-3 has no criminal convictions. CS-3's initial statement to law enforcement on October 3, 2017, was unprotected. During the initial interview, CS-3 admitted to his/her role in the extortion scheme, and his/her knowledge of prostitution regularly occurring at Business 1. After CS-3's initial interview, law enforcement explained to CS-3 that s/he might be charged in connection with this case. Subsequently, CS-3 obtained counsel and agreed to continue cooperating. CS-3's subsequent statements were made pursuant to a proffer letter (which meant that, so long as CS-3 was truthful, the government could not use CS-3's proffer-protected statements against him/her except in narrow circumstances). In January 2019, the government applied for, and the Chief Judge of the Northern District of Illinois granted, statutory use immunity to CS-3 pursuant to 18 U.S.C. § 6002, and it is not anticipated that CS-3 will be charged in connection with the conduct discussed herein. I believe the information provided by CS-3, set forth in this affidavit, is reliable, as it is corroborated in significant respects by independent evidence, including judicially-

18.     According to CS-3, s/he began working security at Business 1 in approximately 1998.  At that time, Individual 1, the spouse of Individual 2, owned and operated Business 1, as well as a restaurant across the street, Business 2. According to CS-3, from the time s/he started working at Business 1 until October 2017, Business 1 dancers regularly performed commercial sex acts for customers in a private area of the club.

19.     According to CS-3, at some point in or around 2003, Individual 1 explained to CS-3 that the mayor of Harvey,  Individual A, had recently come to Individual 1 and demanded that Individual 1 pay Individual A $3,000 per month in exchange for the City allowing Business 1 to continue operating as it had been previously run.  According to CS-3, s/he understood this to mean that Individual A wanted $3,000 per month in exchange for the City allowing prostitution to continue to occur at Business 1.  According to CS-3, Individual 1 also stated that s/he had to hire COREY JOHNSON, who Individual 1 stated was an associate of Individual A, to work security at Business 1. According to CS-3, Individual 1 told CS-3 that JOHNSON was going to start working security two nights per week, at times that CS-3 had previously worked him/herself. According to CS-3, shortly after this conversation, JOHNSON began working security at Business 1.

20.     According to CS-3, for the next approximately 5 years after this conversation, CS-3 had several conversations with Individual 1 in which s/he told CS-

_____

authorized wire interceptions, consensual recordings, physical surveillance, and witness interviews.

3 s/he was making the $3,000 payments to Individual A, and complained about it. According to CS-3, these conversations often occurred when business was slow at Business 1. According to CS-3, s/he did not know how Individual 1 made the payments to Individual A during this period.

21. According to CS-3, on a particular Saturday in or around 2007 or 2008, Individual 1 called CS-3 into Individual 1's office at Business 2. According to CS-3, Individual 1 told CS-3 that Individual A had recently visited Individual 1 and demanded that Individual 1 increase the monthly payments to Individual A from $3,000 to $6,000. According to CS-3, Individual 1 told CS-3 that s/he had refused Individual A's demands.

22. According to CS-3, the following Monday, while CS-3 was working at Business 1, a City of Harvey police officer came to Business 1 and ordered it shut down. According to CS-3, later the same week, Individual 1 instructed CS-3 to reopen Business 1, and CS-3 did so. According to CS-3, later the same day, while CS-3 was working, the same Harvey police officer returned to Business 1 and ordered the club shut down again. According to CS-3, later the same week, Individual 1 instructed CS-3 to reopen Business 1, and CS-3 did so. According to CS-3, later the same day, while CS-3 was working at Business 1, the same Harvey police officer returned to Business 1 and ordered the club shut down for a third time. According to CS-3, during this third visit, the Harvey police officer said words to the effect of, "Tell your boss to just pay the man," which CS-3 understood to mean that the Harvey police would

continue to shut down Business 1 until Individual 1 agreed to pay Individual A $6,000 per month.

23. According to CS-3, after the police shut down Business 1 the third time, Individual 1 told CS-3 that s/he was going to agree to Individual A's demands to pay $6,000 per month. According to CS-3, after Individual 1 told CS-3 that s/he had agreed to pay the $6,000 per month, the Harvey police allowed Business 1 to operate as usual.

24. According to CS-3, and corroborated by public records, Individual 1 died in 2008. According to CS-3, shortly before Individual 1 died, Individual 1 told CS-3 that Individual 4, Individual 1's child, was going to take over the operation of Business 1, and asked CS-3 to help Individual 4 operate the business.

### C. According to CS-3, CS-3 and Individual 4 Paid City Officials Through JOHNSON.

25. According to CS-3, shortly after Individual 1's death, Individual 4 promoted CS-3 to a managerial position at Business 1 and put JOHNSON in charge of running Business 2 (a restaurant across the street), which Individual 4 also operated after Individual 1's death. According to CS-3, one of CS-3's responsibilities in his/her new managerial role was, every Sunday, to collect all cash earned during the week at Business 1 and deliver it to Individual 4 in his/her office at Business 2.

26. According to CS-3, in approximately 2011 or 2012, Individual 4 asked CS-3 to start delivering the weekly amounts of cash earned at Business 1 to Individual 4 at his/her home, instead of at Business 2. According to CS-3, Individual 4 instructed CS-3 that, every other Saturday, CS-3 was to take $3,000 from the cash

earned at Business 1 the previous week, place it in an envelope, and leave the envelope in the top drawer of a desk located in Individual 4's office at Business 2. According to CS-3, Individual 4 explained that the money was for JOHNSON, who delivered the payments to Individual A in exchange for allowing Business 1 to operate. According to CS-3, Individual 4 further explained that Individual B, a City of Harvey police officer,[6] would shut down Business 1 if the payments were not made, and that Business 1 would have problems with Individual B if the payments to JOHNSON were late.

27.     According to CS-3, shortly after this conversation and continuing until approximately October 2017, CS-3 made approximately bi-weekly deliveries of $3,000 in the manner that Individual 4 had instructed. According to CS-3, s/he usually dropped the envelope containing the $3,000 in the desk in Individual 4's office either after CS-3's Saturday night shifts at Business 1, or the following Sunday mornings. According to CS-3, JOHNSON typically was not present when CS-3 dropped off the envelope in the desk. However, according to CS-3, on a few occasions over the course of approximately five years, CS-3 had been late with the $3,000 payment, and had communicated to JOHNSON that the payment would be coming in a few days late. According to CS-3, on at least one occasion, CS-3 delivered a late payment during regular business hours when JOHNSON was present in Individual 4's office. According to CS-3, on this occasion, as CS-3 placed the envelope in the desk,

---

[6]     As noted above, Individual B is Individual A's brother.

JOHNSON appeared to turn away deliberately so as not to look at what CS-3 was doing.

28.    According to CS-3, Individual 4 regularly reminded CS-3 to make the bi-weekly payments to JOHNSON by sending CS-3 text messages, in which Individual 4 referred to the payments as "rent" or "pizza money." According to CS-3, CS-3 and Individual 4 referred to the payments as "pizza" because of where the payments were delivered—to an office in Business 2, a restaurant known for its pizza. According to CS-3, they also referred to the payments as "rent" because, similar to a rental payment, the payments were due on a regular schedule. CS-3 explained that none of the payments to JOHNSON were for legitimate rental payments.[7]

29.    During his/her initial interview, CS-3 provided written consent for law enforcement to search CS-3's cellular telephone. On CS-3's phone, agents found multiple messages from telephone number XXX-XXX-6136, used by Individual 4[8] ("Individual 4 phone"). Specifically, CS-3's phone contained multiple messages from Individual 4 phone, sent in approximately two-week increments that contained reminders for CS-3 to pay "rent" or "pizza." For example, agents recovered a message

---

[7]    As explained above at paragraph 9, Business 1 and the land on which it was located was owned by Individual 2, so there is no reason why Individual 4 would be making legitimate rental payments to JOHNSON and/or the City of Harvey.

[8]    Individual 4 was identified as the user of Individual 4 phone as follows: First, based on service provider records, Individual 4 was the registered subscriber of Individual 4 phone during all periods of interception set forth in this affidavit. Second, I have played recordings of consensually recorded phone calls between CS-3 and the user of Individual 4 phone for agents who interviewed Individual 4 in person in October 2017. According to those agents, they recognize Individual 4 as the user of Individual 4 phone.

sent from Individual 4 phone to CS-3 on September 23, 2017 (a Saturday), that stated, "U remember pizza money too?" Two days prior, September 21, 2017, CS-3 had received a message from Individual 4 phone that stated, "You got rent Saturday," which, according to CS-3, was in reference to a payment due on September 23, 2017. On February 26, 2016, CS-3 received a message from Individual 4 phone that stated, "Horrible week. Rent tomorro. This guy killing me."

**D.** **CS-3 Makes a Controlled Payment to JOHNSON, and CS-3 Discusses with JOHNSON and Individual 4 Whether Payments to JOHNSON's Accomplices Would Continue After Federal Law Enforcement Activity in October 2017.**

30. As set out above, law enforcement's October 3, 2017 search of Business 1 was premised on evidence of prostitution and tax crimes occurring at Business 1. After the October 3, 2017 search, Business 1 closed down for several weeks. After the October 3 search but before Business 1 reopened, CS-3 had several recorded conversations with JOHNSON and Individual 4 about the terms under which Business 1 would reopen, including the resumption of payments to JOHNSON and his accomplices.

31. On or about October 6, 2017, CS-3 reported to law enforcement that, earlier that morning, CS-3 had met with Individual 4 at Individual 4's home. According to CS-3, during the meeting (which was not recorded), Individual 4 directed CS-3 to destroy all of Business 1's ledgers, and to make a $1,500 payment to JOHNSON. According to CS-3, the payment was intended as a partial payment to hold over City officials until Business 1 reopened. According to CS-3, Business 1 had been shut down since the October 3, 2017, search, and Individual 4 was waiting on

approval from the City to reopen. CS-3 provided agents with the $1,500 that, according to CS-3, s/he had received from Individual 4 to give to JOHNSON. Agents photocopied the money and put it into a white envelope, and returned it to CS-3. Agents then searched CS-3 and his/her vehicle and did not find any other large amounts of cash. CS-3 then traveled to Business 2 to meet with JOHNSON.

32. On or about October 6, 2017, at approximately 3:30 pm, CS-3 had a consensually recorded meeting with JOHNSON inside JOHNSON's vehicle in the parking lot of Business 2.[9] During the meeting, JOHNSON and CS-3 discussed whether City officials would permit Business 1 to re-open.[10] Specifically, CS-3 said, "[S/he][11] wants me to get the place back up and running on Monday [October 9, 2017]. So my question to you is, am I going to be okay with Harvey? Here's, here's, here's

---

[9] Unless otherwise stated, all meetings between CS-3 and targets of this investigation were video and audio recorded without the target's knowledge, and done at the direction of law enforcement.

[10] JOHNSON was identified as the individual with whom CS-3 met on October 6, 2017, and in all subsequent in-person meetings between CS-3 and JOHNSON mentioned in this affidavit, as follows: First, law enforcement have shown CS-3 an unmarked photograph obtained from JOHNSON's Illinois driver's license, and CS-3 identified the individual depicted as JOHNSON. Second, for all in-person meetings set forth in this Affidavit in which JOHNSON is identified, CS-3 told law enforcement that JOHNSON was the man with whom s/he met immediately after the particular meeting. Third, law enforcement conducted physical surveillance of some (but not all) of CS-3's meetings with the individual s/he identified as JOHNSON, and confirmed that the individual who met with CS-3 on those occasions was JOHNSON (based on a comparison with JOHNSON's Illinois driver's license photograph). Fourth, I have reviewed all of the video/audio recordings of CS-3's in-person meetings with JOHNSON. JOHNSON was identified in some of the in-person recordings based on a comparison of the video to JOHNSON's Illinois driver's license. JOHNSON was identified in all of the in-person recordings based on voice comparisons between the in-person recordings, and lawfully recorded telephone calls of JOHNSON using JOHNSON phone.

[11] I believe this is a reference to Individual 4.

what I'm saying, I don't want to get in the motherfucker, open it up, and I don't want them come kickin' down the doors, tellin' me—" JOHNSON interjected, "I can ask." CS-3 said, "Shit, you're gonna have to ask." JOHNSON said, "Yeah, I know." CS-3 continued, "You, you, you want me to open it up and then like, you know, if [s/he], if we're not right with fucking, you know, with all that shit [payments to JOHNSON's accomplices] then how am I gonna?" JOHNSON said, "Right." CS-3 continued, "I don't want to be in there, and then they come, you know, now they come in there and want to act like something's going on so now they're gonna fucking raid it again." In response, JOHNSON said, "Yeah . . . . Harvey wasn't the ones in there, was they?" [JOHNSON asked if City of Harvey law enforcement carried out the October 3, 2017 search of Business 1.] CS-3 said, "No, that's what I'm saying no, Harvey didn't fuck with us at all . . . ." Later in the conversation, CS-3 said, "I don't want fucking [Individual B's last name redacted] kicking in, you know, [Individual B's last name redacted] don't like me anyways, so I don't want that motherfucker kicking in the door and try to fuck with me while I'm there." JOHNSON responded, "Yeah, that motherfucker [Individual B] put some tickets on my truck in my yard and shit, man." CS-3 said, "Okay, see, that's what I'm talking about. Like I can't have all that fucking . . ." JOHNSON interjected, "But he can't do shit if a motherfucker's being ran right. Can't do a motherfucking thing." [Individual B could not demand or collect extortion payments if prostitution was not occurring at Business 1.] Later in the conversation, CS-3 said, "Well, [s/he][12] gave me fucking, you know, [s/he] gave me some shit, so."

_____

[12]    I believe this is a reference to Individual 4.

[Individual 4 gave CS-3 an extortion payment to deliver to JOHNSON.] JOHNSON responded, "Right, right." CS-3 said, "I'll just take it back over there and I'll put it back over there." [According to CS-3, "put it back over there" was a reference to dropping the $1,500 in the desk in Individual 4's office, which was CS-3's normal practice for making payments to JOHNSON.] CS-3 said, "It's half [$1,500, half or the usual $3,000 payment], so I don't know what the fuck they're going to say about it. If they're gonna say, just give me a heads up if they're gonna not be . . . ." JOHNSON laughed. CS-3 continued, "Yeah but I, what am I supposed to tell [him/her][13]? I mean, I'm gonna go talk to [him/her], so should I tell [him/her] that, you know, 'You better have it all? You better not have it all?'" JOHNSON responded, "I'd say, 'Just operate the business as usual,' you know what I'm saying?" CS-3 said, "Yeah. Operate the, right, but I mean, obviously, as usual, but not obviously with fucking . . ." JOHNSON interjected, "Well, shit, I wouldn't, I would just hold up on that. Period." [JOHNSON told CS-3 that Business 1 should "hold up" on that, which CS-3 and I understood to mean that Business 1 should temporarily stop allowing prostitution to occur onsite and making payments to JOHNSON in the wake of the search of Business 1.] CS-3 responded, "Yeah, but if I hold up on that, are they gonna, is something gonna happen?" JOHNSON responded, "I can find out . . . I'd say just, if they let you open back up, open it, open it up and run it right." CS-3 said, "Well they're gonna give me the key. It ain't them [the FBI] I'm worried about." JOHNSON said, "Yeah." CS-3 continued, "It's fucking Harvey. Harvey is the one that's gonna come fuck with us."

---

[13]     I believe this is a reference to Individual 4.

JOHNSON said, "You, you, should worry about Harvey. You haven't paid, been having no problem. Now they might try to come in and see, you know, try to, you know, make sure a motherfucker's being ran right and shit." CS-3 responded, "Yeah, I'm not, I'll make sure that it's run, being how, just how it was, but like, you know, better, like how it's going. But as far as, you know, the pizza money stuff [extortion payments] . . . ." JOHNSON said, "Oh, okay. Yeah, yeah." CS-3 continued, "That's what I'm asking about." JOHNSON responded, "I'll ask. I'll ask." CS-3 then said, "I'm not even like, like [s/he][14] gave me half of it [extortion payment] now. But I'm saying like, I don't want to put it in there and then they fuck around, if you just, all you gotta do is text me, 'No.' Like, 'No.' And then I'll tell [him/her], 'Hey, man. Just give me the other half so I can make this regular shit happen.'" [CS-3 told JOHNSON to text him "no" if his accomplices did not accept the $1,500 payment, and CS-3 would get the full payment of $3,000 from Individual 4.]

33. At the end of the meeting, CS-3 said, "I'm going to run in there and I'll just put the rent in there." [CS-3 told JOHNSON s/he was going to drop the $1,500 inside Business 2.] According to CS-3, at this point, s/he exited JOHNSON's vehicle and walked to Individual 4's office inside Business 2. According to CS-3, s/he then placed the envelope containing the money in the top desk drawer, where CS-3 typically left payments for JOHNSON (the video recording device briefly becomes unobstructed at this point and depicts what appears to be an office, and a desk drawer

---

[14]    I believe this is a reference to Individual 4.

opening and closing, but it is not possible to see from the recording what, if anything, was put into the desk).

34. On or about October 6, 2017, at approximately 4:44 p.m., CS-3 had a consensually recorded meeting with Individual 4. The meeting occurred inside Individual 4's car in a parking lot in Homer Glen, Illinois.[15] During the meeting, CS-3 discussed the payment CS-3 had just delivered to JOHNSON, and Individual 4 stated s/he planned to discontinue payments to JOHNSON. Specifically, CS-3 said, "[H]e [JOHNSON] only got $1500. So I don't even know if he's gonna take the 1500, it might, might have to be 3 [$3,000]." Individual 4 stated, "Well, I don't have it and he ain't, I ain't giving him no more rent. I'm not, I, I'll—" Later in the conversation, CS-3 said, "Well, you had rent due fucking Saturday." [CS-3 said that, as of the previous Saturday, Individual 4 owed JOHNSON a $3,000 extortion payment.] Individual 4 stated, "I wasn't going to pay it!" CS-3 said, "And then what, you're gonna—" Individual 4 interjected, "I was gonna wait, that's what. I was gonna wait." CS-3 said, "You were gonna have me, have me go over there and fucking try to open it [Business 1] up?" Individual 4 stated, "Well, I would have dealt with it when the time came, yeah, I mean—" CS-3 interjected, "The time, if it, if I open the doors, you

---

[15] Individual 4 was identified as the individual with whom CS-3 met on October 6, 2017 as follows: First, according to CS-3, the individual with whom s/he met on October 6, 2017, at approximately 4:44 p.m. was Individual 4 (whom CS-3 had previously identified in an unmarked photograph obtained from Individual 4's Illinois driver's license); (2) Second, agents who interviewed Individual 4 in person have listened to the audio recording of this meeting and identified Individual 4 as the person with whom CS-3 met (the video recording device was obstructed during the meeting and consequently Individual 4 is not depicted in the video recording).

know them dirt, what happened last time when you had that problem? Didn't you, what did you close down for last time? Something?" Individual 4 stated, "The fire." CS-3 said, "Oh, yeah, the fire."[16] Individual 4 stated, "They made me pay." [JOHNSON and his accomplices ("they") made Individual 4 continue to make regular extortion payments even when Business 1 temporarily shut down due to a fire.]

35.     Immediately after CS-3's meeting with Individual 4, CS-3 traveled to a predetermined location to meet with agents. During the meeting, CS-3 told agents s/he had dropped the envelope containing the $1,500 in the drawer of the desk located in Individual 4's office in Business 2, as was CS-3 and JOHNSON's usual practice. Agents then searched CS-3 and his/her vehicle and did not recover any of the $1,500 that CS-3 was directed to give to JOHNSON.

36.     On or about October 7, 2017, at approximately 6:16 pm, CS-3 received an incoming iMessage text communication from JOHNSON, using JOHNSON phone, which stated, "Okay." [JOHNSON's accomplices had accepted the $1,500 payment and authorized Business 1 to continue operations.][17]

---

16    According to CS-3, in or around January 2014, there was a fire at Business 1 that caused significant damage and forced the club to close down for several weeks. According to CS-3, s/he continued to make payments to JOHNSON during the period Business 1 was shut down after the fire.

17    Based on my involvement in the investigation and review of subscriber and toll records, I know that from at least October 2017 through May 2018, JOHNSON phone was an iPhone. Based on my involvement in this investigation, I know that CS-3 also used an iPhone for all of his/her communications with JOHNSON. Based on my training and experience, as well as my discussions with other law enforcement agents, and review of information provided by Apple personnel to federal law enforcement, I know that iPhone to iPhone text message are sent as "iMessage" communications. Based on the location of the Apple servers that process data associated with iMessage communications, I know that when one iPhone located within the state of Illinois sends an iMessage communication to a second iPhone located within the state of

37.     On or about October 18, 2017, at approximately 12:45 pm, CS-3 had a consensually recorded meeting with JOHNSON inside JOHNSON's vehicle, which was parked in a parking lot near 130th Street and Ashland Avenue in Harvey.[18] During the meeting, JOHNSON advised CS-3 that his confederates wanted the remainder of an extortion payment to be made. JOHNSON told CS-3, "Shit man, they was wondering where the other half of that was." [JOHNSON's accomplices were wondering when CS-3 would pay the "other half" ($1,500) of the payment made on October 6, 2017.] CS-3 asked, "Are you fucking kidding me?" JOHNSON said, "Yeah, they was talking about, um, that they would, you know, because there was a prostitution sting, they were talking about, like, shutting it down until you come up with, um, like the papers on everybody that work there, and all this and all that shit." CS-3 asked, "Well I got papers for fucking everyone who work down there . . . So what the fuck do they want, man?" JOHNSON replied, "They was wondering when you was going to do the other half of that." CS-3 asked, "I mean, I was hoping they were going to fucking give me a break on fucking getting it rolling." JOHNSON said, "Yeah, me too, that's what I thought." CS-3 asked, "So when's the next fucking thing due, this Saturday?" JOHNSON replied, "Yeah." CS-3 asked, "So they're looking for three and fifteen hundred?" [CS-3 asked if JOHNSON's accomplices expected CS-3 to pay $4,500 (the regular $3,000 extortion payment plus the $1,500 remainder of the last payment) by that Saturday.] JOHNSON answered, "They was looking for that fifteen

---

Illinois, the iMessage communication is necessarily routed through out-of-state servers before it is received by the second iPhone.

[18]     This meeting was audio recorded only.

today." CS-3 advised JOHNSON that s/he didn't have $1,500 at that time, and that s/he would have to return to Individual 4 to get the money. Later in the conversation, JOHNSON said, "Man, I wish there was a way we could get away from them motherfuckers, man." [JOHNSON wanted to stop collecting extortion payments from Business 1 for his accomplices.] CS-3 asked, "How we gonna get away from them?" JOHNSON said, "I don't know." CS-3 said, "You tell me a fucking way, and I'd love to get away from them." JOHNSON said, "I'm gonna come up with something though because I'm sick of these motherfuckers, man." CS-3 asked, "When is he [Individual A] out of office?" JOHNSON said, "Um, shit, next year, not this coming year, but the following year."[19] CS-3 said, "Aw man, he [Individual A] got two fucking years left?" JOHNSON said, "Yeah . . . Well, he got a little better than a year, about a year and, almost a year and a half." Later in the conversation, CS-3 said, "Shit, I'm worried about if I open up, they come and rip all the licenses off the fucking wall and start shit." JOHNSON said, "Well, we'll have them straight by then, won't we?" CS-3 said, "Well yeah, I have to get them straight by then, I've got no fucking choice!" Later in the conversation, CS-3 said, "Well, I guess I have to go tell [him/her][20], and get it. Fucking, we'll do the same shit." [CS-3 had to tell Individual 4 that JOHNSON's accomplices wanted back due extortion payments, and regular payments going forward.] JOHNSON said, "I know [s/he]'s scared than a motherfucker. I can't blame

---

[19]    Based on public source information, I know that, at the time of this conversation, Harvey's next mayoral election was scheduled for on or about February 26, 2019, and Individual A was not running for re-election.

[20]    I believe this is a reference to Individual 4.

[him/her] though." [CS-3 and I understood JOHNSON to mean that he knew Individual 4 was scared to continue making payments while s/he was under law enforcement scrutiny since the October 3, 2017 search of Business 1.]

38. On or about October 20, 2017, at approximately 5:00 pm, CS-3 had a consensually recorded meeting with JOHNSON at Business 2.[21] During the meeting, JOHNSON told CS-3 that JOHNSON's accomplices would permit Business 1 to reopen, and further payments would not be necessary, so long as prostitution did not resume at Business 1, but that such payments would be necessary if prostitution was going to continue at Business 1. Specifically, JOHNSON said, "They say we can't stop from opening . . . So long as they stay straight, ain't nothing motherfuckers can do about it." [JOHNSON told CS-3 that his accomplices were taking the position that Business 1 could continue operations without making further payments so long as prostitution did not resume.] CS-3 responded, "Who's saying that? You're saying that or they're saying that?" JOHNSON replied, "No, that's what they told me . . . [unintelligible] . . . If you stay straight, ain't nothing a motherfucker can do about it, you know. But if they catch you wrong, they, you know, gonna holler at you." JOHNSON explained how the extortion payment arrangement between Business 1 and JOHNSON's accomplices originally came about: "That was some shit that [Individual 1's nickname redacted] and them had put together, and that was on some dirty freak pimping. I mean, shit, if you on it straight, you going straight, ain't nothing else I can do for you." [Individual 1 and JOHNSON's accomplices had set up

---

[21]    This meeting was audio recorded only.

the extortion payment arrangement based on an understanding that prostitution was occurring at Business 1. If prostitution no longer occurred at Business 1, JOHNSON no longer needed to collect payments.] JOHNSON continued, "If ain't no crooked shit in here, a motherfucker can't come in here and fuck with you . . . That's they word to me. As long as it's straight. You gonna be the only ones in town runnin' a straight game, though." CS-3 said, "No one's running a straight game." JOHNSON responded, "You know that." [All other adult clubs in Harvey were providing prostitution services.]

39. According to CS-3, and corroborated by later consensual recordings, detailed below, approximately one week later, on or about October 27, 2017, Business 1 reopened.[22] According to CS-3, CS-3 resumed his/her managerial role at Business 1 on or about October 31, 2017. As explained below, despite the fact that prostitution did not resume at Business 1 after it reopened, Individual B, JOHNSON, and others soon resumed their demands for payments simply to allow Business 1 to continue operations.

---

[22] Law enforcement instructed CS-3 not to allow prostitution to resume at Business 1. As part of this effort, on or about October 13, 2017, CS-3 met with Business 1 employees and instructed them that prostitution would be prohibited at Business 1 when operations resumed. From the time Business 1 reopened until CS-3 stopped working there in or around May 2018, CS-3 regularly provided confirmation to law enforcement that prostitution had not continued at Business 1. Law enforcement corroborated CS-3's reporting by confirming that the private stalls in the back of Business 1 where acts of prostitution had previously occurred were dismantled, and there did not appear to be any other similarly private areas in the club where prostitution could occur.

### E. JOHNSON Advises Payments Must Continue After Individual B and Individual C Make a Surprise Inspection of Business 1.

40. According to CS-3, and corroborated by consensual audio recordings and Business 1 surveillance camera footage, as explained below, on or about November 9, 2017, at approximately 1:20 pm, Individual B[23] and another City of Harvey police officer, Individual C,[24] visited Business 1 for a purported building inspection while CS-3 was working. CS-3 was wearing an audio recording device at the time of the inspection. During the visit, CS-3 walked Individual B around the interior of Business 1 as Individual B ostensibly checked on various parts of the building,

---

[23]    Individual B was identified as one of the two police officers who visited Business 1 on or about November 9, 2017, as follows: First, based on a comparison between Individual B's Illinois driver's license photograph and Business 1 surveillance video from November 9, 2017, I can identify Individual B as one of the Harvey police officers who visited Business 1 on that day. Second, prior to the November 9, 2017 inspection, law enforcement had showed CS-3 an unmarked photograph of Individual B (obtained from his Illinois driver's license), and CS-3 identified the individual depicted as the man CS-3 knew as "[Individual B's last name redacted]," one of the two police officers with whom CS-3 met at Business 1 on or November 9, 2017. Third, I have reviewed the November 9, 2017 audio recording and have compared it to known voice samples of Individual B obtained through interception of Individual B's phone, as well as video recordings of in-person meetings that another source in this investigation has had with Individual B (in which videos I can identify Individual B based on a comparison with his Illinois driver's license photograph). Based on my comparison of the November 9, 2017, audio recording with these known voice samples of Individual B, I recognize Individual B as one of the speakers in the November 9, 2017 audio recording.

[24]    Individual C was identified as one of the two police officers who visited Business 1 on or about November 9, 2017, as follows: First, based on a comparison between Individual C's Illinois driver's license photograph and Business 1 surveillance video from November 9, 2017, I can identify Individual C as one of the Harvey police officers who visited Business 1 on that day. Second, following the November 9, 2017 inspection, law enforcement showed CS-3 an unmarked photograph of Individual C (obtained from his Illinois driver's license), and CS-3 identified Individual C as the other police officer who visited Business 1 on or about November 9, 2017.

including the plumbing and fire code compliance.[25] At times during the inspection, Individual B spoke privately to CS-3. At one point, Individual B spoke to CS-3 about the FBI's execution of the search warrant at Business 1 on October 3, 2017. Individual B told CS-3, "They didn't have to make no showing like that . . . that was ridiculous man, I mean that was the stupidest shit I ever saw in my life, do it like that, get out of here, that didn't make no fucking sense." Toward the end of the inspection, Individual B separated from CS-3 and began speaking to another Business 1 employee. Individual B stated, "I'm going to approve you for your liquor license, but what I'm saying is, we're gonna, like, I'm gonna come back unexpected one time and . . . ." At this point, the recording becomes unintelligible. According to CS-3, Individual B warned the Business 1 employee that he was going to drop in for an unexpected inspection during Business 1's normal business hours, and if Individual B caught Business 1 doing anything wrong, there would be problems.

41.     According to CS-3 and partially corroborated by the audio recording (where audible), while Individual B was speaking to the other Business 1 employee, Individual C (the other Harvey police officer who accompanied Individual B to Business 1) approached CS-3 and, standing with his face next to CS-3's, began speaking quietly to CS-3. In the audio recording, it is possible to hear an adult male,

---

[25]     Based on my involvement in this investigation, including witness interviews and review of wire interceptions, I know that, in addition to his duties as a police officer, Individual B is also an employee and *de facto* head of the City of Harvey's Department of Building and Planning. Individual B's legitimate duties as a Building and Planning Department employee include the inspection of businesses in Harvey to ensure compliance with municipal code.

whom CS-3 later identified as Individual C, speaking quietly to CS-3.[26] Much of the conversation is inaudible. At one point, it is possible to hear Individual C telling CS-3, "I run this place." Seconds later, Individual C can be heard saying, "They make the police come." Seconds after that, Individual C stated, "I don't have that much time." At several points in the conversation, CS-3 can be heard saying, "Yes, sir." According to CS-3, during the above portion of the encounter on November 9, 2017, Individual C told CS-3, in summary, that the Harvey police would shut down Business 1 if there were any problems going forward, and that it was CS-3's responsibility to make sure no problems arose. According to CS-3, Individual C did not specify what he meant by "problems."

42.     According to CS-3 and the audio recording, immediately after Individual C finished speaking privately to CS-3, Individual B approached CS-3 and Individual C and stated, "Okay, we good then? Alright, I'm going to go see Corey [JOHNSON] now." According to CS-3, and corroborated by the audio recording and video surveillance footage, it appeared to CS-3 that Individual B had deliberately stepped away from Individual C while he delivered the message to CS-3, and then rejoined them as soon as Individual C was finished.

---

[26]     CS-3 is outside the frame of the video surveillance device at this point. Individual C is partially visible on camera and it appears he is standing and speaking to someone who is standing in an area immediately off camera. The video depicts CS-3 stepping into that same off-camera area immediately before Individual C approaches, and also depicts CS-3 stepping back into frame from that off-camera area after Individual C finishes. Based on the video, Individual B is not involved in Individual C's conversation with the off-camera individual, and appears to be speaking to someone else at certain points during this time. Immediately after Individual C finishes his conversation, Individual B rejoins CS-3 and Individual C, and appears to say something to CS-3. Individuals B and C then exit Business 1 together.

43. After Individual B and Individual C's visit to Business 1, agents instructed CS-3 to set up a meeting with JOHNSON.

44. On or about November 14, 2017, at approximately 6:00 pm, CS-3 met JOHNSON at a Marathon gas station located at 147th Street and Dixie Highway in Harvey. During the meeting, CS-3 wore concealed audio recording equipment, but the equipment failed to function properly.[27]

45. During a debriefing with law enforcement immediately after CS-3's meeting with JOHNSON, CS-3 told agents that CS-3 and JOHNSON had discussed Individual B's recent visit to Business 1 on or about November 9, 2017. According to CS-3, CS-3 asked JOHNSON what Individual B meant when he told Business 1 employees that he would be coming by to make a surprise inspection in the near future. According to CS-3, JOHNSON told CS-3 that s/he knew what Individual B meant—specifically, that Individual "wants that lick," which CS-3 understood to mean that Individual B wanted Business 1 to resume making regular payments, and would use inspections as a pretext to shut down Business 1 if the payments did not resume. According to CS-3, JOHNSON further stated that "they" wanted that money, which CS-3 understood to mean that, contrary to JOHNSON's prior representation that his City officials would not require payments if prostitution did not resume at Business 1 (see paragraph 38), Individual B and other City officials wanted Business 1 to resume making payments, whether or not prostitution

---

[27] According to CS-3 and physical surveillance, at approximately 6:00 pm, CS-3 arrived at the designated meeting location and met with JOHNSON inside of JOHNSON's vehicle.

continued at Business 1. According to CS-3, CS-3 told JOHNSON that Business 1 did not want to have any problems with the City going forward. According to CS-3, JOHNSON said that "they" wanted a $7,500 payment to keep Business 1 in operation, which CS-3 understood to mean that City officials were demanding that Business 1 catch up on past due payments (since the October 2017 FBI search) to continue operating. According to CS-3, s/he told JOHNSON s/he needed time to get the payment together. According to CS-3, s/he and JOHNSON agreed they would be in touch regarding the next payment, and the meeting ended.[28]

46.     Based on (i) CS-3's interaction with Individual B and Individual C, including Individual B's suggestion of an unexpected return to Business 1, and the manner in which Individual C singled out CS-3 during the meeting; (ii) Individual B's statement that he was going to visit JOHNSON immediately after the surprise inspection of Business 1; (iii) JOHNSON's statements to CS-3 days later that the purpose of Individual B's visit to Business 1 on or about November 9, 2017 was because he "wants that lick," and that the payments were expected to continue, I believe the purpose of Individual B's and Individual C's visit to Business 1 on or about November 9, 2017, was to threaten CS-3 and Business 1 with possible closure, so that payments to JOHNSON would resume.

---

[28]     CS-3's statement to agents that, during the November 14, 2017 meeting, JOHNSON told him/her that Individual B visited Business 1 on or about November 9, 2017 because he "wants that lick" is corroborated in part by JOHNSON's recorded statements to CS-3 two days later on November 16, 2017 (see paragraph 49).

**F.      CS-3 Resumes Extortion Payments to JOHNSON.**

47.     On or about November 15, 2017, at approximately 2:59 p.m., CS-3 placed a consensually recorded phone call to JOHNSON, who was using JOHNSON phone. During the call, CS-3 asked JOHNSON when he could make the next payment to JOHNSON. Specifically, CS-3 and JOHNSON discussed the fact that one of JOHNSON's accomplices was out of town for a week, which, according to CS-3 (and corroborated during a subsequent conversation the following day, see paragraph 49), was a reference to Individual B. Specifically, CS-3 said, "He ain't going to be in town until next week?" JOHNSON said, "Yeah, yeah, he told me he was leaving last week." CS-3 then stated, "Alright, well, I got some of that pizza [extortion payment] ready anyways, but, I mean, I could just wait 'til." JOHNSON said, "Okay, alright." CS-3 said, "So uh, just let me know when you want to, you know, hook up or something, let me know." JOHNSON said, "Alright."

48.     On November 16, 2017, at approximately 5:10 pm, CS-3 met with law enforcement, who provided him with $4,500 in pre-recorded United States currency inside a white envelope. Agents then searched CS-3 and his/her vehicle and did not find any other large amounts of currency. CS-3 then traveled to a nearby gas station to meet with JOHNSON.

49.     On or about November 16, 2017, at approximately 5:26 p.m., CS-3 had a consensually-recorded meeting with JOHNSON in the vicinity of a Marathon gas station in or around Harvey. The meeting took place inside of JOHNSON's vehicle.

During the meeting, CS-3 made a $4,500 payment to JOHNSON and asked whether this payment was sufficient to permit Business 1 to reopen. Specifically, CS-3 said, "Alright I got 15 [$1,500], and I got the 3 [$3,000], so I only got 45 [$4,500]. You gonna be able to make it . . . ." [CS-3 told JOHNSON that CS-3 had a total of $4,500 in payments, not the full $7,500 JOHNSON's accomplices were demanding.] [CS-3 explained that at this time in the meeting, s/he provided JOHNSON with the envelope containing the $3,000 by handing the envelope directly to JOHNSON.][29] JOHNSON said, "Yeah, I'll be able to . . . I got to go get the license and shit tomorrow . . . ." [JOHNSON was going to pick up Business 1's renewed liquor license (which Individual B approved during his visit to Business 1 on November 9, 2017) the following day.] CS-3 said, "Yeah, [s/he][30]'s been blowing me up about the license . . . But if he's [Individual B] coming back this weekend, I don't want him to be fucking running up . . . ." JOHNSON responded, "I'm going to see [Individual B's last name redacted] tomorrow." CS-3 continued, "That's what I'm saying, I don't want him running up in the club without him having something. So, when he gets that, see like what kind of schedule I need to be on." [CS-3 told JOHNSON that s/he wanted to make sure that Individual B received the $4,500 that CS-3 had just delivered to

---

[29]   Unless otherwise noted, due to the angle of CS-3's recording device, nothing material was captured on video during CS-3's meetings with JOHNSON and KELLOGG set forth in this Affidavit. According to CS-3, in all of his/her meetings with JOHNSON, s/he delivered the envelope containing the money by either handing it directly to JOHNSON, or by putting the envelope containing the money into the glove compartment in JOHNSON's vehicle (in JOHNSON's presence). In many (but not all) of the recordings, CS-3 verbalized the money delivery by saying things like, "Here's three thousand" or "three grand."

[30]   I believe this is a reference to Individual 4.

JOHNSON, so that Individual B did not shut down Business 1 in the coming days. CS-3 further told JOHNSON to ask Individual B about a payment schedule for future Business 1 extortion payments when JOHNSON delivered the $4,500 payment to Individual B.] JOHNSON said, "Right." Later in the conversation, CS-3 said, "I talked to [him/her][31], I went over to the pizza place . . . I gave [him/her] the whole run down, you know, we still got the inspection, he [Individual B] told me he was going to be back in there." JOHNSON said, "The inspection is done, ain't it?" CS-3 said, "Yeah, but he [Individual B] said, I told you!" JOHNSON said, "Oh no, you know what he wanted." CS-3 said, "Yeah, I know what he [Individual B] wanted, but—" JOHNSON interjected, "That's all, that's all, it'll be alright." [Individual B would not conduct future inspections of Business 1 so long as extortion payments continued.] CS-3 said, "Well . . . I need to get back on, like, what the schedule is . . . I mean, see if you can skate by with the $4,500 . . . unless they say I got to have the rest of it." JOHNSON said, "They should, they should." CS-3 replied, "Corey, man, don't leave me fucked up, just tell me what the fuck I got to do . . . . I don't want no more bullshit, I don't want Harvey running in there, I don't want nobody fucking with me." JOHNSON replied, "Okay, alright." JOHNSON told CS-3 he would call CS-3 the following day when he was "over there." CS-3 said, "Don't be like calling on the phone, just say, 'the pizza.'" [CS-3 told JOHNSON not to openly discuss the extortion payments on the phone, and to just refer to them as "the pizza."] JOHNSON replied, "Okay." CS-3 then exited JOHNSON's vehicle.

---

[31] I believe this is a reference to Individual 4.

35

50.     After his/her meeting with Individual 4, CS-3 traveled to a predetermined location to meet with investigating agents. CS-3 told agents s/he delivered the $4,500 to JOHNSON during their meeting minutes earlier. Agents searched CS-3 and his/her vehicle and did not find the $4,500 that they had provided to CS-3 to give to JOHNSON.

51.     CS-3 and JOHNSON later arranged to meet on November 22, 2017, at a local forest preserve for CS-3 to deliver the next $3,000 payment. Prior to CS-3's meeting with JOHNSON on November 22, 2017, agents provided CS-3 with $3,000 in pre-recorded United States currency in a white envelope. Agents then searched CS-3 and his/her vehicle and did not find any other large amounts of cash. CS-3 then departed for the meeting with JOHNSON.

52.     On or about November 22, 2017, at approximately 9:30 a.m., CS-3 traveled to the forest preserve and had a consensually recorded meeting with JOHNSON inside of JOHNSON's vehicle.[32] During the meeting, CS-3 provided JOHNSON with a $3,000 payment, and JOHNSON demanded an additional $6,000 in payments. Specifically, JOHNSON said, "What's that?" CS-3 said, "3." [CS-3 explained that at this time in the meeting, s/he provided JOHNSON with the envelope containing the $3,000 by placing the envelope in JOHNSON's glove box] JOHNSON said, "Oh, shit." CS-3 asked, "How much was it supposed to be?" JOHNSON replied, "Supposed to be 6, so the one last week and then this week was up." [JOHNSON told CS-3 s/he was supposed to be delivering $6,000 to JOHNSON

---

[32]     This meeting was audio recorded only.

that day, to cover that week's payments, and past due payments.] CS-3 responded, "Oh, what the fuck? So how much I owe now?" JOHNSON said, "Just 3, and then the week after this one." CS-3 responded, "Wait, alright, hold on, hold on . . . . So we paid 15, I gave you 15 [$1,500] to start. Then I just gave you 45 [$4,500]." JOHNSON said, "Man, I don't even know. I don't keep track of that shit man." CS-3 said, "Right, that's what they're saying?" JOHNSON responded, "Yeah, they saying last week was supposed to be one, and this week was supposed to be off, and then next week is one." CS-3 said, "Alright, so this weekend I'm good." JOHNSON replied, "No, I think last week, we still want for last week." CS-3 asked, "Alright, so what do I owe? So I'm giving you 3 now." JOHNSON answered, "3, 3." [JOHNSON told CS-3 s/he still had to make $3,000 in payments to catch up with what was owed.] CS-3 responded, "So when do I, so I owe you 3 before, alright, so when's the next payment supposed to be?" JOHNSON replied, "Ah, not this week but next week." CS-3 said, "So can I just give you 6 [$6,000] on the next week?" JOHNSON responded, "Yeah, yeah." Later in the conversation, CS-3 told JOHNSON that CS-3 was worried about Individual B making a "surprise inspection" at Business 1 since CS-3 was not caught up on payments. CS-3 said, "And your boy said he's fine, [Individual B's last name redacted] ain't fucking around?" JOHNSON said, "I really haven't had a chance to talk with him [Individual B]. . . ." CS-3 said, "He [Individual B] told me like three or four times with that fucking surprise inspections, so I wanna make sure he don't surprise my ass over there." JOHNSON responded, "Well, if I tell him [Individual B] that everything be straight the next time around . . . ." CS-3 said, "Tell him [Individual B], not this week, wait,

not next weekend but the following weekend . . . . If I square up with 6, then I'll be back on every other fucking . . . ." [CS-3 told JOHNSON to tell Individual B that CS-3 would be caught up with outstanding payments by the following weekend (by making a $6,000 payment to JOHNSON).] JOHNSON replied, "Right, right."

53.     After his/her meeting with JOHNSON, CS-3 traveled directly to a predetermined location to meet with agents. CS-3 told agents that s/he provided the $3,000 to JOHNSON during their meeting. Agents searched CS-3 and his/her vehicle and did not find the $3,000 that agents provided to CS-3 to give to JOHNSON.

54.     On or about November 30, 2017, at approximately 6:35 pm, CS-3 placed a consensually recorded call to JOHNSON, who was using JOHNSON phone. During the call, CS-3 and JOHNSON discussed meeting the following day in a "private" place for CS-3 to deliver a payment. Specifically, CS-3 said, "You want to hook up tomorrow or what?" JOHNSON said, "That's cool." CS-3 asked, "You want to do it in the same spot or . . . what are you thinking?" JOHNSON said, "That little gas station on the corner [unintelligible] that's a little more private." CS-3 asked, "Which one?" JOHNSON said, "Right there, Marathon, off of Dixie." CS-3 said, "Shit, that motherfucker ain't that private." JOHNSON said, "Better than that park, I didn't know that park was like that." [JOHNSON said that the Marathon gas station was more private than the park/forest preserve where CS-3 and JOHNSON met on November 22, 2017.] CS-3 said, "Oh, you didn't know it was, well . . .at least you know who's in that motherfucker when you go in there." JOHNSON said, "In that park? . . . Okay, alright. What time?" CS-3 said, "Um, I don't know, could you do it

around lunch so I could just swing over there and just dump it [the payment]." JOHNSON said, "Yeah, okay, I'll be there at noon." I believe JOHNSON's desire to meet in a private location to receive money from CS-3 is further proof that the payments JOHNSON has received from CS-3 are unlawful extortion payments.

55.     On or about December 1, 2017, at approximately 11:40 a.m., CS-3 met with agents, who provided CS-3 with $3,000 in pre-recorded United States currency inside a white envelope. Agents then searched CS-3 and his/her vehicle and did not find any other large amounts of cash. CS-3 then departed for his/her meeting with JOHNSON.

56.     On or about December 1, 2017, at approximately 12:00 p.m., CS-3 had a consensually recorded meeting with JOHNSON at a park in the south suburbs. According to CS-3 (and corroborated by what is visible in the video recording), CS-3 and JOHNSON stood outside their vehicles in a grassy area. During the meeting, CS-3 and JOHNSON then discussed the possibility of CS-3 opening up a nightclub together.[33] CS-3 told JOHNSON they needed to get their nightclub up and running while JOHNSON's family members were still in power in City government. CS-3 said, "You guys got, fucking, a year and a half left in this motherfucker, I mean . . . ." [Individual A and his administration had a year and a half left in office in the City's government.]  JOHNSON said, "They got a year and a half, shit, I ain't got shit." Later in the conversation, JOHNSON told CS-3 that if CS-3 wanted to open his/her

---

[33]     This was a ruse scenario that law enforcement directed CS-3 to pursue in an effort to obtain a meeting with the City officials and/or their associates on whose behalf JOHNSON was collecting payments from CS-3.

own club, CS-3 should do it "straight up legit, man you know, don't go through them motherfuckers." JOHNSON further stated, "They don't do shit for me, so I mean, what the fuck." JOHNSON and CS-3 then discussed how everyone seemed to be making money except for them. JOHNSON said, "Those motherfuckers with the City of Harvey, they doing fine. You [CS-3], [him/her][34], y'all are doing fine." CS-3 said, "Man, how the fuck am I doing fine if I'm out here fucking with you?" Moments later, CS-3 asked JOHNSON how he wanted to receive that day's payment. CS-3 said, "You tell me, you want me to put that [payment] in the car, or how you want me to work that?" JOHNSON said, "Yeah." According to CS-3 and the video recording, s/he and JOHNSON then walked to JOHNSON's car; JOHNSON got inside the driver's seat while CS-3 stood beside the opened passenger door. [CS-3 explained that at this point in the recording, s/he handed the envelope containing the $3,000 to JOHNSON]. CS-3 said, "Just tell the motherfuckers, shit, if they got a problem, just tell them to yell at me . . . It's going to take another, I'll have it [the next payment] by the end of this week." JOHNSON said, "Okay, alright then," and the meeting ended.

57.     After his/her meeting with JOHNSON, CS-3 traveled directly to a predetermined location to meet with agents. CS-3 told agents that s/he provided the $3,000 to JOHNSON during their meeting. Agents searched CS-3 and his/her vehicle and did not find the $3,000 that agents provided to CS-3 to give to JOHNSON.

58.     Over the next several months, at the direction of agents, CS-3 continued to meet with JOHNSON to deliver controlled payments. All of the meetings were

---

[34]     I believe this is a reference to Individual 4.

video and audio recorded (with the exception of April 12, 2018, which was audio recorded only), and most occurred in parks and/or forest preserves in the south suburbs of Chicago. Specifically, CS-3 made the following additional payments to JOHNSON at the direction of investigating agents, and purportedly on behalf of Business 1[35]: December 8, 2017 ($3,000); December 14, 2017 ($3,500, of which $500 was for JOHNSON)[36]; December 21, 2017 ($500 for JOHNSON); December 30, 2017 ($3,000); January 19, 2018 ($3,000); January 26, 2018 ($3,000); February 8, 2018 ($3,000); February 22, 2018 ($3,000); March 8, 2018 ($3,000); March 23, 2018 ($3,000); April 12, 2018 ($3,000); April 23, 2018 ($3,00); May 3, 2018 ($3,000).

59.     Before each meeting listed above, agents provided CS-3 with the pre-recorded funds in a white envelope to deliver JOHNSON, searched CS-3 and his/her vehicle, and did not find any other large amounts of cash. CS-3 traveled directly from these meetings with agents to his/her meetings with JOHNSON. After each meeting with JOHNSON, CS-3 traveled to predetermined locations to meet with agents, where agents searched CS-3 and his/her vehicle and did not find the money that agents had provided CS-3 to give to JOHNSON. After each meeting with JOHNSON, CS-3 confirmed with agents that s/he delivered the money to JOHNSON during the

---

[35]    All of CS-3's controlled payments to JOHNSON after October 6, 2017, were made without Individual 4's knowledge/involvement.

[36]    Agents directed CS-3 to give JOHNSON $500 on December 14 and 21, 2017, for JOHNSON to keep for himself, after JOHNSON had complained at earlier meetings with CS-3 (discussed above) that he did not profit from acting as an intermediary in collecting Business 1 payments. The December 14 and 21, 2017 payments to JOHNSON were the only times that CS-3 delivered money to JOHNSON for JOHNSON to keep for himself.

meeting. Agents conducted physical surveillance of some of CS-3's meetings with JOHNSON discussed in paragraph 58, and were able to identify JOHNSON at the meetings based on this surveillance.

### G. ROMMELL KELLOGG Directs JOHNSON's Collection of Extortion Payments from Business 1, and KELLOGG Admits Enlisting JOHNSON to Receive Payments from Business 1.

60.     During the series of controlled payments that CS-3 made to JOHNSON in 2017 and 2018, wire interceptions and consensually recorded conversations established that ROMMELL KELLOGG, who is Individual A's and Individual B's brother, supervised and directed JOHNSON in the collection of extortion payments from Business 1, and that JOHNSON delivered at least a portion of these payments to KELLOGG after receiving them from CS-3.

61.     On or about December 13 and 14, 2017, through a series of consensually recorded phone calls, CS-3 and JOHNSON arranged to meet on December 14, 2017.

62.     Prior to CS-3's meeting with JOHNSON on December 14, 2017, at approximately 10:30 a.m., agents provided CS-3 with $3,500 in pre-recorded United States currency inside a white envelope (the additional $500 was for JOHNSON to keep for himself). Agents then searched CS-3 and his/her vehicle, and did not find any other large amounts of currency.

63.     On or about December 14, 2017, at approximately 10:50 a.m., CS-3 had a consensually recorded meeting with JOHNSON in the south suburbs of Chicago. Based on the video/audio recording of the meeting, which took place inside JOHNSON's car, CS-3 got in the front passenger seat of JOHNSON's car and, based

42

on the video recording, took out a white envelope that appeared to be full. CS-3 then stated, "Three grand." [CS-3 explained that at this time in the meeting, s/he provided JOHNSON with the envelope containing the $3,000.] CS-3 and JOHNSON then discussed the possibility of opening up a new nightclub in Harvey together. CS-3 said, "Shit, do you know how much I can make in a night?" JOHNSON said, "Yeah." CS-3 said, "Honestly, I can make, in a night, we were making over by [Business 1], $10-15 grand in a night . . . So that's what I'm saying, I get in there make $20-30 thousand in a weekend . . . Shit, break off [Individual B's last name redacted], or whatever the fuck, them guys, break their money off to 'em." JOHNSON said, "That's a motherfucker man." CS-3 then told JOHNSON s/he would be willing to meet with City officials to discuss the idea of CS-3 and JOHNSON opening up their own club.

64.     On or about December 14, 2017, at approximately 2:05 pm, Individual B made an outgoing call on Individual B phone to ROMMELL KELLOGG, who was using KELLOGG phone. During the conversation, Individual B stated, "Where you at man, I need to, I need to, I need to tell you about this pizza thing. I forgot to tell you. It's very important. Where you at?" Based on the timing of this call (roughly 3 hours after CS-3 had told JOHNSON that they could earn large profits by operating their own club and be in a position to make payments to Individual B and others); Individual B's use of the word "pizza," which, as explained above, is the code-word that CS-3, JOHNSON, and KELLOGG (see paragraph 79) used to refer to illicit payments from CS-3; and Individual B's unwillingness to discuss the matter over the

phone with KELLOGG, I believe Individual B was telling KELLOGG that he needed to speak to him regarding illegal activity that concerned CS-3.

65.     On or about December 14, 2017, at approximately 7:35 pm, JOHNSON received an incoming call on JOHNSON phone from KELLOGG, who was using KELLOGG phone. During the call, KELLOGG confirmed that JOHNSON had recently met with CS-3. Specifically, KELLOGG asked, "Just seeing if you touched bases with somebody?" [KELLOGG asked JOHNSON if he had met with CS-3 and received the payment.] JOHNSON responded, "Yeah, yeah." KELLOGG asked, "You did?" JOHNSON responded, "Yeah." KELLOGG then asked, "Aight, uh, how 'bout half an hour?" [KELLOGG asked if he could meet with JOHNSON in 30 minutes to pick up the money from JOHNSON.] JOHNSON asked, "How lo—, how long?" KELLOGG responded, "Half an hour." JOHNSON said, "Okay, aight."

66.     CS-3 and JOHNSON later arranged to meet on or about December 21, 2017, at a forest preserve in Dixmoor, Illinois, for CS-3 to deliver the next payment to JOHNSON. Prior to CS-3's meeting with JOHNSON, on December 21, 2017, at approximately 11:00 a.m., agents provided CS-3 with $500 in pre-recorded United States currency to give to JOHNSON (for JOHNSON to keep personally). Agents then searched CS-3 and his/her vehicle, and CS-3 departed for his/her meeting with JOHNSON.

67.     On or about December 21, 2017, at approximately 11:25 a.m., CS-3 traveled to the forest preserve and had a consensually recorded meeting with JOHNSON. During the meeting, CS-3 paid JOHNSON $500 for his role in acting as

an intermediary in collecting Business 1 payments from CS-3, but did not deliver any payment for JOHNSON's accomplices. Based on the audio recording, CS-3 counted out the money and stated, "Here's $500." [CS-3 explained that at this point in the recording, s/he handed the $500 to JOHNSON.] Later in the meeting, CS-3 asked JOHNSON to arrange a meeting with City officials about opening a new nightclub: "Why can't I meet this motherfucker, [Individual B's last name redacted]? Tell this motherfucker to come see me, or let's call him." JOHNSON responded, "I ain't never met that motherfucker." CS-3 asked, "Who?" JOHNSON said, "[Individual B's last name redacted]."[37] "Oh, you just go to the other brother?" [According to CS-3, by "other brother," CS-3 meant ROMMELL KELLOGG, who like Individual B, is a brother of Individual A, the mayor of Harvey. This interpretation is confirmed by the toll record and intercepted call referenced in the paragraphs 68 and 69, respectively.] JOHNSON responded, "Yeah, somebody else, yeah." CS-3 said, "Shit, there's only two fucking brothers! [Individual A only had two brothers] . . . There's the big one and the little one that's fucking howling all the time . . . . Shit, the other one's big though, he's like a bigger dude." [According to CS-3, s/he was referring to KELLOGG as the "big one" and Individual B as "the little one." Based on my involvement in this investigation, including physical surveillance of KELLOGG and Individual B, I know that KELLOGG is taller and heavier than Individual B.] JOHNSON said, "Who?" CS-3 said, "His [Individual A] other brother, fucking, [Individual A's last name

---

[37] Based on other evidence in this case, including the information contained in paragraphs 42, 47, and 49 of this affidavit, I believe JOHNSON's statement that he has never met (or does not deal directly with) Individual B is false.

redacted] other brother . . . Don't he have another brother, that big fucker?
[KELLOGG]. JOHNSON said, "Big motherfucker?" CS-3 said, "Well, he's bigger than
fucking [Individual B's last name redacted]." JOHNSON said, "Yeah, he wider than
him, yeah." CS-3 said, "I'm ready to meet him [KELLOGG]." JOHNSON said,
"Alright, I'll set it up." CS-3 said, "Shit, call him . . . He's not going to talk to me or
what?" JOHNSON said, "Let me see." According to CS-3, JOHNSON then dialed a
number on his cellphone. According to CS-3 and the audio recording, moments later,
JOHNSON turned on the speakerphone function on his phone, and an automated
voicemail function stated, "[KELLOGG phone number redacted] is not available, at
the tone. . ." JOHNSON did not leave a message. CS-3 again told JOHNSON to set
up a meeting between CS-3 and KELLOGG, and JOHNSON said he would. Later in
the meeting, JOHNSON said, "I'll talk to him [KELLOGG] this evening, shit yeah, if
it will get me out of it, hell yeah." CS-3 said, "Yeah, see I don't want to keep fucking
with you, I'm going to take care of you anyways because you gotta keep fucking with
me with this—" JOHNSON interjected, "They might be able to arrange something
for that, to get me out of that." [JOHNSON said his accomplices might be able to
arrange something with CS-3 whereby JOHNSON no longer served as an
intermediary in collecting extortion payments.] CS-3 said, "Oh, what, you mean, just
straight fuck with them?" JOHNSON said, "Yeah, you know." CS-3 said, "Why you
trying to get the fuck out of that?" JOHNSON said, "I never wanted to be in it from
the beginning. [Individual 1's nickname redacted] just didn't trust nobody . . . They
didn't trust nobody." [JOHNSON became an intermediary in collecting payments

from Business 1 because Individual 1 and JOHNSON's accomplices did not trust anyone else to do it.] CS-3 told JOHNSON that, once CS-3 left Business 1, JOHNSON's accomplices would have problems collecting payments from Individual 4. Specifically, CS-3 said, "Right now, [s/he][38] feels like, 'Fuck it. I ain't gotta do shit.'" JOHNSON said, "And that's how they feel, shit, they don't need it. You know? Shit. They don't give a fuck one way or the other, I'm going to tell you that right now." CS-3 asked, "What do you mean?" JOHNSON said, "I mean, that's just one club [Business 1]. Shit, this a big ass city . . . . They could do with or without [him/her]." CS-3 said, "Right, but I'm saying, they'll shut [his/her] ass down." [JOHNSON's accomplices would shut down Business 1 if Individual 4 refused to continue making payments to JOHNSON and his accomplices.] JOHNSON said, "Exactly." Later, CS-3 again told JOHNSON to set up a meeting between CS-3 and KELLOGG. CS-3 said, "The dude [KELLOGG] knows me, at least, before you send him over, tell him, 'Hey, this is the guy been doing shit [making payments on behalf of Business 1],' I been doing shit for 5 years." JOHNSON said, "Right . . . We'll set it up as soon as possible." The meeting ended minutes later.

68.     A review of toll records for JOHNSON phone, I know that at approximately 11:30 a.m., which was during the course of this recorded meeting, an outgoing call was placed on JOHNSON phone to KELLOGG phone.

69.     On or about December 21, 2017, at approximately 3:51 pm, KELLOGG made an outgoing call on KELLOGG phone to JOHNSON, who was using JOHNSON

---

[38]     I believe this is a reference to Individual 4.

47

phone.[39] During the call, JOHNSON told KELLOGG that CS-3 wanted to meet with KELLOGG. Specifically, KELLOGG asked, "You called me earlier?" JOHNSON replied, "Yeah, uh, (unintelligible) motherfucker [CS-3] want, [s/he] want, old [boy/girl] wanna talk." [JOHNSON told KELLOGG that CS-3 wanted to talk to KELLOGG.] KELLOGG responded, "Oh about, uh, what we were talking about?" JOHNSON answered, "Yeah. Yeah. I think [s/he], [s/he], you know, I don't know what the fuck the game is, but [s/he] want to set up, you know, a little old talk and shit." KELLOGG said, "Oh. Alright. I'm gonna get with you later and talk to ya." JOHNSON replied, "Yeah." KELLOGG said, "You know . . . . How you feel, how you feel about things."

70. On or about January 16, 2018, at approximately 6:32 pm, KELLOGG made an outgoing call on KELLOGG phone to JOHNSON, who was using JOHNSON phone. During the call, KELLOGG and JOHNSON discussed when JOHNSON was to receive the next payment from CS-3, and KELLOGG said that he planned to meet with CS-3. Specifically, KELLOGG said, "I'm trying to wrap it up brother." [KELLOGG wanted JOHNSON to collect CS-3's next payment and deliver it to him.] JOHNSON replied, "I think it's gonna be. I think it's gonna be tomorrow. In the morning. I'll meet [him/her] over there." KELLOGG replied, "Ah, yeah, please." JOHNSON added, in part, "When I touch base with you, you know, I wanna chop it up with you for a minute. Yeah, with my thoughts." KELLOGG responded, "Yeah, yeah, yeah." After JOHNSON said, "Okay, I'll call you tomorrow," KELLOGG said,

---

[39]     This call occurred approximately 4 hours after CS-3's meeting with JOHNSON ended.

"I'm definitely gonna meet with [him/her][40] or you want somebody else to meet with him? Which one?" JOHNSON indicated no preference who attended the meeting. KELLOGG continued, "Yeah, okay, but we gonna have a meet."

71.     On or about January 17, 2018, at approximately 1:59 pm, KELLOGG made an outgoing call on KELLOGG phone to JOHNSON, who was using JOHNSON phone. During the conversation, KELLOGG advised JOHNSON that he was meeting with City officials about CS-3. Specifically, KELLOGG said, "Okay, sir. I'm up here with your cousin[41] and this other guy. Told him that, uh, I may have, uh, a meeting with this, these people [CS-3], you know?" JOHNSON said, "Yeah." KELLOGG continued, "Cuz there could be a problem. So I don't know." Later in the conversation, KELLOGG said, "Alright, I thought you said you had to get up and get out and meet." [Based on the conversation described in paragraphs 70 and 72, I believe KELLOGG is asking JOHNSON about his next intended meeting with CS-3 to collect a payment.] JOHNSON said, "Yeah, I thought, you know, I usually meet [him/her] early, but . . . ." KELLOGG responded, "Yeah, okay, well let me know cuz I told them, uh, I'll let them know when this meeting gonna be."

72.     On or about January 17, 2018, at approximately 6:56 p.m., KELLOGG made an outgoing call on KELLOGG phone to JOHNSON, who was using JOHNSON

---

[40]     I believe this is a reference to CS-3.

[41]     According to CS-3, JOHNSON is cousins with Individual A, Individual B, and KELLOGG. In the context of this intercepted call, I believe KELLOGG is referring to Individual A or Individual B when he says "cousin," based on their positions as City officials, and the fact that KELLOGG appears to telling JOHNSON that he is speaking to individuals with authority to approve CS-3's plan to open a new nightclub.

phone. During the call, KELLOGG advised JOHNSON that he needed money. KELLOGG said, "Yes sir, what are you doing boss? . . . I need uh, gas money, I need some food money, I need, you know." [KELLOGG told JOHNSON he needed JOHNSON to collect that week's payment from CS-3.] JOHNSON replied, "I'll call you as soon as I get back out that way."

73.     Through a series of consensually-recorded communications between CS-3 and JOHNSON, CS-3 arranged to meet JOHNSON on January 19, 2018.

74.     Prior to CS-3's meeting with JOHNSON on January 19, 2018, at approximately 1 p.m., agents provided CS-3 with $3,000 in pre-recorded United States currency inside a white envelope. Agents then searched CS-3 and his/her vehicle and did not find any other large amounts of cash. CS-3 then departed for his/her meeting with JOHNSON.

75.     On or about January 19, 2018, at approximately 1:17pm, CS-3 traveled to the south suburbs of Chicago, where s/he had a consensually recorded meeting with JOHNSON inside CS-3's car. CS-3 stated, "Here's the shit." [CS-3 explained that at this point in the recording, s/he handed the envelope containing the money directly to JOHNSON]. CS-3 said, "They didn't say shit about me being late?" [CS-3 asked JOHNSON if his accomplices said anything to JOHNSON about CS-3 being late on that week's payment.] JOHNSON said, "Well, you know, they was asking, but I wasn't going to fuck with you, shit." CS-3 said, "Shit, and I'm still looking, I'm still going to take care of you, I just, man, I had a rough fucking week getting my shit together, and I know we gotta get it next week, so I really gotta [unintelligible]."

Thereafter, CS-3 said, "So what's up? Let's call these motherfuckers. Tell 'em I need, I want to get up out of there." [CS-3 asked JOHNSON to call his accomplices because CS-3 wanted to leave his/her job at Business 1 soon.] JOHNSON responded, "They'll be there tonight." CS-3 asked, "Where?" JOHNSON responded, "To come and get this [that day's payment]." The meeting ended shortly thereafter.

76.     After CS-3's meeting with JOHNSON, s/he traveled to a predetermined location and met with agents. During the meeting, CS-3 told agents s/he delivered the $3,000 to JOHNSON. Agents searched CS-3 and his/her vehicle, and did not find the $3,000 that agents had provided to CS-3 earlier that day to deliver to JOHNSON.

77.     On or about January 19, 2018, at approximately 3:52 pm, KELLOGG received an incoming call on KELLOGG phone from JOHNSON, who was using JOHNSON phone. During the call, KELLOGG and JOHNSON coordinated meeting shortly after JOHNSON received $3,000 from CS-3. JOHNSON said, "Come holla at me after I get there." KELLOGG responded, "Alright. How long you going to be?" JOHNSON replied, "I'll get there at five." KELLOGG and JOHNSON agreed to meet at approximately 5:30 p.m. that evening. Based on the foregoing intercepted calls and consensual recordings, I believe that JOHNSON delivered a $3,000 extortion payment to KELLOGG and others on January 19, 2018, and advised KELLOGG of CS-3's wish to meet KELLOGG for purposes of discussing the opening of a new nightclub in Harvey.

78.     JOHNSON later arranged for CS-3 to meet with KELLOGG at Business 1 for purposes of discussing CS-3's plan to open a new nightclub in Harvey. On or

about January 23, 2018, at approximately 3:00 pm, CS-3 had a consensually recorded meeting with KELLOGG[42] inside an office at Business 1. During the meeting, CS-3 and KELLOGG discussed CS-3's interest in opening a new nightclub, and KELLOGG confirmed that KELLOGG had enlisted JOHNSON as an intermediary to receive extortion payments for KELLOGG and others. Specifically, CS-3 said, "I need to get a new club." KELLOGG told CS-3 that a possible location for the new club that CS-3 had previously discussed with JOHNSON was "out of the question." KELLOGG then asked, "What's happening right here [at Business 1]? What's the problem?" CS-3 told KELLOGG that Individual 4 had been difficult to work with since "the raid," meaning the FBI's search of Business 1 in October 2017. CS-3 said, "[S/he][43] feels now that [s/he] doesn't have to do certain things in this place that need to be taken care of [CS-3 said that Individual 4 felt that s/he no longer had to make payments to JOHNSON]." KELLOGG interjected, "But you know what needs to be taken care of." CS-3 responded, "But I know what needs to be taken care of." KELLOGG stated, "Right, right." Returning to the topic of CS-3 opening his/her own nightclub, CS-3 said, "I've got to have the blessing from the City." KELLOGG responded, "Right."

---

[42]      KELLOGG was identified as the individual with whom CS-3 met on January 23, 2018, at Business 1 as follows: (1) after the meeting, law enforcement showed CS-3 an unmarked photograph of KELLOGG obtained from his Illinois driver's license, and CS-3 said that this was a photograph of the man with whom he had met on January 23, 2018; (2) KELLOGG introduced himself to CS-3 as "Rod," which, based on judicially authorized wire intercepts, I know is a nickname that KELLOGG goes by; (3) during the January 23, 2018 meeting, CS-3 asked for KELLOGG's phone number, and KELLOGG gave CS-3 the number for KELLOGG phone, which was subscribed to KELLOGG; and (4) I have listened to several recordings of KELLOGG's voice over KELLOGG phone, and I recognize it to be the same voice as the person with whom CS-3 met on January 23, 2018.

[43]      I believe this is a reference to Individual 4.

CS-3 said s/he was willing to do "only a weekend thing" with the new nightclub, and then stated, "However they [City officials] want me to do it is going to be fine with me." KELLOGG replied, "I'll look into it. Cuz I'll talk about it and, uh, see what's what." KELLOGG added, "What I have to see is a liquor license first. Gotta have a liquor license at that, at that address. And there is some slots that have liquor licenses that I can think of . . . You understand? That makes it much easier, if that location has a liquor license first . . . Then come around the backdoor and push you for that, uh, business you talking about." [KELLOGG would try to think of locations for CS-3's new club for which liquor licenses had already been issued. Once that was taken care of, KELLOGG could "push" for other business, which CS-3 understood to mean prostitution.] Later in the conversation, CS-3 and KELLOGG returned to the topic of Individual 4. CS-3 said, "But [s/he] still wants me there [Business 1]. [S/He] still wants me to stick around and make [him/her] money." KELLOGG interjected, "Because [s/he] trusts you." CS-3 continued, "Right. [S/He] still wants me to make [him/her] money, but [s/he] don't want to do everything right [make payments to JOHNSON]." KELLOGG responded, "Well, wanna do things, [s/he]'s got to. This is business!" CS-3 responded, in part, "It's a business, but it ain't [his/her] town. You can't just dictate what you want to do. You have to follow the rules. If you follow the rules, then, you know, you make your money." [Individual 4 had to follow "the rules" of doing business in Harvey by continuing to make extortion payments to JOHNSON.] KELLOGG replied, "Everybody, everybody makes money."

79.     Towards the end of the meeting, CS-3 asked for KELLOGG's phone number. KELLOGG agreed to give his number to CS-3, but said, "Well, you know, you can call me on certain things, but I still talk to Corey [JOHNSON]." CS-3 said, "Corey told me that he wanted to get out of delivering pizzas [extortion payments]." KELLOGG responded, "He can't get out of nothing. He can't get out of nothing." [KELLOGG said that he would not allow JOHNSON to stop serving as an intermediary for receiving and delivering extortion payments from Business 1 to KELLOGG.] Later in the conversation, CS-3 said, "And you said still, still with pizza to deal with him [JOHNSON]? Still, right?" KELLOGG responded, "Yeah, yeah, yeah." CS-3 again stated that JOHNSON wanted to "get out of this shit," and KELLOGG responded, "He ain't getting out of nothing because that's the way it goes. That's convenient for me, convenient for you. That's convenient. And when I put him in place with [Individual 1's nickname redacted], it was smooth for [Individual 1's nickname redacted]. Everything was smooth. I liked it . . . That's how I like it." Later in the conversation, KELLOGG told CS-3, "That's how business is sometimes. When it slow up, it still keep going." [KELLOGG said that Business 1 had to continue making extortion payments even though business had slowed for Business 1 since the law enforcement search in October 2017.] Agreeing with KELLOGG, CS-3 said, "Corey [JOHNSON] said, 'Hey man, you know, they didn't break an agreement with you, you breakin' an agreement with them!' And I told [him/her][44] the same thing, I said, 'Listen, when you was making all the money, you didn't bring 'em extra."

---

[44]     I believe this is a reference to Individual 4.

KELLOGG interjected, "Right!" CS-3 continued, "'So why, when you not making enough, it's all the same, it's always just the same." [KELLOGG agreed that Business 1's payment arrangement had to continue on the same terms whether business was good or bad for Business 1.] KELLOGG continued, "I told [Individual 1's nickname redacted], over there, when we was in [his/her] office, I said, 'You know, you're going to have to pull the plug on that.' And [s/he] was thrifty. You know? You know, [s/he] knew how to squeeze a quarter, make it scream." CS-3 responded, "You know what, I was here, I was here when we were paying." [According to CS-3, at this point in the recording, s/he held up three fingers, indicating that s/he was referring to the pre-2008 arrangement when Business 1 made payments of $3,000 per month (see paragraphs 19-21 above).] KELLOGG said, "Yeah." CS-3 continued, "And, and he was like, 'Nah, I ain't going to do it." [According to CS-3, s/he was referencing the incident in approximately 2008 when Individual 1 initially refused Individual A's demand that Business 1 increase the monthly payment amount from $3,000 to $6,000] KELLOGG said, "Yeah." CS-3 continued, "Then, you know, we had problems for a bit." KELLOGG said, "Yeah, yeah!" CS-3 said, "I was here for it! And I was like, 'Aw, shit.' And then [s/he][45] finally just said, 'You know what? I gotta get it done." [Individual 1 agreed to pay $6,000 monthly payments]. KELLOGG said, "Right, right." KELLOGG continued, "[S/he][46] just don't know the other side of the business. This is all business. It's always been about business. And whenever you

---

[45] I believe this is a reference to Individual 1.

[46] I believe this is a reference to Individual 4.

in business, you gonna' encounter people that you have to deal with." CS-3 said, "If I walk away from here today, you or someone would have to go talk to [him/her][47] because [s/he] wouldn't do what [s/he] had to do [continue making payments]. That's what I'm saying, and I just don't like it." KELLOGG responded, "Right, right." KELLOGG continued, "Well, if things come down to it, then [s/he]'s gonna have to come talk. Really. [S/he]'s gonna have to come talk. And [unintelligible] if I talk to [him/her], [s/he]'s gonna have to listen to reason because, umm, I'm not gonna tell [him/her] anything that hurt. Nothing. Just, just something that will teach, man, listen, you don't get in position to have a building that you don't have to lift a finger and money is being put in your pocket." [KELLOGG said that, if Individual 4 refused to continue making extortion payments, KELLOGG would "teach" him/her that s/he would not be allowed to continue operating a business in Harvey that earned him/her large amounts of money without "lifting a finger."] CS-3 said that s/he would try to reason with Individual 4. KELLOGG responded, in part, "You can tell [him/her] that you talked to me if you want. But you don't have to. When it's time, I'll talk to [him/her]. But when it's time, you may not be here. But I may have to talk to [him/her], you know? We'll see what's on the flip side of that coin, alright."

80.     Later in the conversation, KELLOGG discussed with CS-3 the need for Business 1 dancers to be more discreet in soliciting commercial sex work from potential clients. Specifically, KELLOGG stated, "About four years ago . . . the girl approached me and said, 'You want a hand job?' and I said 'No, I want you to get up

---

[47]     I believe this is a reference to Individual 4.

56

there and dance.' I said, 'How much is a hand job?' '$75,' she said, 'But I'll give you everything for $225.' I said, 'Everything, like what?' Girl didn't know me from nowhere, you know what I mean? And I tell her, 'This is not the way you approach.'" CS-3 stated, "Hell no." KELLOGG continued, "You, you first of all, this...this is the deal, and I've never had it in this place in my life. Take 'em to, umm, a private dance, and when you private dancing—" CS-3 stated, "Right, right." KELLOGG continued, "And when they get to that point where they got you, say, 'here, can I,' let them ask ... they gonna ask. You think they not? Alright [KELLOGG stated that, once Business 1 dancers were performing private dances for clients, the clients were likely to ask the dancer to perform commercial sex acts, so the dancers would not have to solicit commercial sex work themselves]." The meeting ended shortly thereafter.

81. On or about January 23, 2018, at approximately 3:32 pm, KELLOGG made an outgoing call on KELLOGG phone to JOHNSON, who was using JOHNSON phone. During the call, KELLOGG advised JOHNSON of his meeting with CS-3. Specifically, KELLOGG said, "Listen, I'll call you a little later and run into you. You know I had that conversation. Just leaving." KELLOGG added, "Yeah, so I'll let you know what's going on."

82. On or about January 25, 2018, at approximately 1:38 p.m., CS-3 placed a consensually recorded call to JOHNSON, who was using JOHNSON phone. During the call, CS-3 asked JOHNSON to meet him/her at a local forest preserve so CS-3 could "get the pizza shit . . . out the way." [CS-3 asked JOHNSON to meet so CS-3

could deliver an extortion payment.]  CS-3 and JOHNSON agreed to meet at the forest preserve the following day at 11:00 a.m.

83.    On or about January 26, 2018, at approximately 10:20 a.m., CS-3 met with agents, who provided CS-3 with $3,000 in pre-recorded bills contained in a white envelope. Agents then searched CS-3 and his/her vehicle and did not find any other large amounts of cash. CS-3 then departed for his/her meeting with JOHNSON.

84.    On or about January 26, 2018 at approximately 10:43 a.m., CS-3 traveled to a forest preserve near Harvey for a consensually recorded meeting with JOHNSON. According to CS-3 (and corroborated by what is visible on the video recording), the meeting occurred inside JOHNSON's car.  According to CS-3, as soon as s/he entered JOHNSON's vehicle, s/he delivered the money by placing the envelope containing the money in JOHNSON's glove compartment. CS-3 then described to JOHNSON his/her recent meeting with KELLOGG.  Among other things, CS-3 described how s/he had told KELLOGG that JOHNSON was "trying to get the fuck away from this shit."  CS-3 told JOHNSON that KELLOGG had stated, "That's not happening for Corey."  JOHNSON told CS-3 that JOHNSON had not seen KELLOGG since CS-3 had met with him.  CS-3 responded, "Well, when you got this shit [payment], fucking, you know you can blast over there."  JOHNSON replied, "Yeah, I know, he'll probably come tonight." [KELLOGG would likely pick up the payment from JOHNSON that night.]  When CS-3 indicated that he was hopeful about getting approval from KELLOGG and City officials to open a new nightclub, JOHNSON said, "If they got the power to do it, why the fuck not?"

85.     After CS-3's meeting with JOHNSON, s/he traveled to a predetermined location and met with agents. During the meeting, CS-3 told agents s/he delivered the $3,000 to JOHNSON. Agents searched CS-3 and his/her vehicle, and did not find the $3,000 that agents had provided to CS-3 earlier that day to deliver to JOHNSON.

86.     On or about January 27, 2018, at approximately 4:19 pm, KELLOGG placed an outgoing call on KELLOGG phone to JOHNSON, who was using JOHNSON phone. During the call, KELLOGG discussed meeting with JOHNSON and a call KELLOGG received from CS-3. Specifically, KELLOGG asked, "When you going to be out and about, sir?" JOHNSON said, "I be heading back that way, it will be about 5 when I check in over there." KELLOGG further stated, "Listen, want to know what, uh, you know I did, uh, one thing, I gave [CS-3's first name redacted] my number. And I want to know why he's, why he's calling me to keep me in check or something or what?" JOHNSON responded, "You know, you know what's up. Shit, sweating the motherfucker." [JOHNSON said that CS-3 was anxious to advance his/her plan to set up a new nightclub so was calling KELLOGG directly.] KELLOGG replied, "Well, [s/he] can't, [s/he] can't sweat me now. You know, [s/he]'ll find out that that's impossible."

### H.     CS-3 Misses a Payment to JOHNSON, and Individual B and Individual C Return to Business 1 and Demand to See CS-3.

87.     As explained above at paragraph 58, through February and March 2018, at the direction of agents, CS-3 continued to make regular approximately bi-weekly controlled payments to JOHNSON, including a payment on or about March 23, 2018. Based on the bi-weekly schedule, after the March 23 payment, CS-3's next payment

was due to JOHNSON the week of April 2, 2018. CS-3, however, missed that week's payment and did not inform JOHNSON the payment was going to be late.

88. Telephone toll records reflect that JOHNSON phone and KELLOGG phone had approximately one contact on April 5, 2018, two contacts on April 6, 2018, and two contacts on April 7, 2018. Telephone toll records also reflect that KELLOGG phone and Individual B phone had approximately one contact on April 5, 2018, two contacts on April 6, 2018, and three contacts on April 7, 2018.

89. Based on surveillance video obtained from Business 1, on or about April 8, 2018, at approximately 12:22 a.m., Individual B and Individual C arrived at Business 1 together.[48] Individual B made contact with Security Guard 1, a security guard at Business 1, in the front entranceway of Business 1, and made a hand signal that appeared to indicate Individual B wanted to speak to Security Guard 1 privately. Individual B and Security Guard 1 spoke briefly by the front door, with Individual C standing immediately behind Security Guard 1. Individual B then signaled for Security Guard 1 to follow him outside, and Individual B, Security Guard 1, and Individual C exited Business 1 together. Shortly after the three men exited Business 1, the video depicts Security Guard 2, who was also working security at Business 1 that night, enter the front entranceway from inside Business 1, and follow Individual

---

[48] Individual B and Individual C were identified based on my comparison of the surveillance video to photographs of Individual B and Individual C that I obtained from records maintained by the Illinois Secretary of State.

B, Security Guard 1, and Individual C to the area immediately outside of Business 1's front door.

90.     According to Security Guard 2, who was later interviewed by law enforcement, and corroborated by video surveillance, Security Guard 2 stood behind Security Guard 1 as Individual B and Individual C spoke to him.   According to Security Guard 2, s/he could see and hear what was being said. According to Security Guard 2, Individual C began speaking to Security Guard 1 in an aggressive manner, and repeatedly stuck his finger into Security Guard 1's chest.[49] According to Security Guard 2, Individual C first lectured Security Guard 1 about wearing a shirt that said "police" on it, when Security Guard 1 was not a police officer (based on the video, Security Guard 1 was wearing a t-shirt that said "POLICE K-9" on the front). According to Security Guard 2, Individual C then asked Security Guard 1 where CS-3 was. According to Security Guard 2, Individual C did not ask for CS-3 by name, but by race and physical description, which, according to Security Guard 2, was an obvious reference to CS-3, because s/he was the only Business 1 employee who fit the distinctive description Individual C provided.   According to Security Guard 2, Security Guard 1 told Individual B and Individual C that CS-3 was not there, and then asked what their visit was regarding. According to Security Guard 2, Individual C then stated words to the effect of, "[S/he] needs to get with us. [S/he] knows what this is about." According to Security Guard 2, s/he had worked security at Business 1 on 20-30 occasions prior to April 8, 2018. According to Security Guard 2, it was

---

[49]     This is depicted on the surveillance video.

unusual for the Harvey police to visit Business 1 unless they were conducting a license inspection, responding to a complaint, or taking some type of enforcement action. According to Security Guard 2, there were no complaints or police enforcement action at Business 1 that evening. Agents showed Security Guard 2 complete footage of Individual B and Individual C inside of Business 1 during their April 8, 2017 visit. After reviewing the video, Security Guard 2 stated it was clear that Individual B and Individual C did not conduct a license check while inside Business 1.

91. On or about April 9, 2018, at approximately 2:14 pm, CS-3 placed a consensually recorded phone call to JOHNSON, who was using JOHNSON phone. During the call, CS-3 apologized for failing to make the payment that was due the prior week. Specifically, CS-3 said, "Hey Corey, I'll have it to you, like, this week, man. Just tell that guy, could you do me a favor and call and tell Rod [KELLOGG] that, man, that was no, I didn't mean that as no, no disrespect. I totally just fucking, I totally forgot about that, like . . . . I don't know why I was thinking I did it last week." [CS-3 asked JOHNSON to tell KELLOGG that CS-3 intended no disrespect in failing to make that week's payment. CS-3 further stated he mistakenly thought he had paid JOHNSON the week prior.] JOHNSON said, "No." CS-3 said, "That's why when you were calling me, I couldn't get my shit together." JOHNSON said, "I told them you forgot already." [JOHNSON told KELLOGG and Individual B that CS-3 forgot to make the bi-weekly payment.] CS-3 said, "Don't tell them I'm on no silly shit or nothing like that. . . . Sorry about that, Corey." JOHNSON said, "Okay, alright then."

92.     On or about April 11, 2018, at approximately 4:53 pm, CS-3 placed a consensually recorded phone call to KELLOGG, who was using KELLOGG phone. During the call, CS-3 apologized to KELLOGG for being late with the last payment. Specifically, CS-3 said, "Hey, how you doing boss?"  KELLOGG responded, "Alright, how are you doing [CS-3]? How's everything with you?"  CS-3 said, "Everything's going well, um, I just want to—" KELLOGG interjected, "I, I couldn't tell. Uh, everything's going well? Shit, right, so uh . . . ."  [CS-3 and I understood KELLOGG to be saying he could not tell everything was "going well" with CS-3 since s/he was late with the last payment.]  CS-3 responded, "Hey, first of all, I want to tell you . . . I apologize . . . I definitely don't want to piss you off with anything."  KELLOGG responded, "Right."  Later in the conversation, CS-3 said, "[S]hit, [Individual B's last name redacted] slid down on us on Saturday, so I'm, like I said, I'm not, definitely not trying to get on your bad side.  That was totally my fault and I'm going to see uh . . . I was going to see Corey [JOHNSON] tomorrow anyways to make sure that's all taken care of."  KELLOGG responded, "Alright, I got ya, I got ya."  CS-3 continued, "That's not gonna happen again [being late with a payment].  So you know that I'm all square with that."  KELLOGG said. "Got you, alright."

93.     After missing the April 5, 2018, payment, CS-3 resumed making approximately bi-weekly payments to JOHNSON at the direction of law enforcement. Specifically, CS-3 met with and paid JOHNSON $3,000 on April 12, April 23, and May 3, 2018.

### I. In May 2018, CS-3 Left Business 1 and Made a Final $3,000 Payment Directly to KELLOGG; KELLOGG said He Planned to Confront Individual 4 About the Need to Continue Making Payments After CS-3's Departure.

94.     In May 2018, law enforcement instructed CS-3 to advise JOHNSON of CS-3's plan to discontinue work at Business 1.

95.     On or about May 16, 2018, at approximately, 1:13 p.m., CS-3 placed an outgoing call to JOHNSON, who was using JOHNSON phone.  During the call, CS-3 told JOHNSON that s/he needed to speak to KELLOGG about CS-3's plans to leave Business 1.  Specifically, CS-3 said, "Hey, I had a quick question for you, do you think you can . . . get me a meeting with Rod [KELLOGG]? . . . Here's the deal . . . I'm about to get out at [Business 1]."  CS-3 explained to JOHNSON that Individual 4 was no longer letting CS-3 handle the money at the business, and that CS-3 felt that s/he was being "pushed out."  Later in the conversation, CS-3 said, "So maybe I can talk to him [KELLOGG] and tell him what's going on there, if he's got any thoughts on it, you know? Cause I don't want to fuck nothing up with what I got going on." JOHNSON said, "Right, right . . . Yeah, I can, I can ask."  CS-3 said, "Well tell him, tell him what's going on . . . As it's looking right now, he's probably going to be doing [unintelligible], because I know he's been angling for it for a while . . . . You know that guy's been angling for that shit for a long time [according to CS-3, by "angling,' s/he meant KELLOGG was making plans to collect future payments directly from Individual 4]." JOHNSON said, "Oh yeah." CS-3 further stated that s/he did not want KELLOGG to be "surprised" by CS-3's departure from Business 1. JOHNSON agreed to call KELLOGG and try to arrange a meeting.

96. On or about May 17 and 19, 2017, through a series of iMessage text communications, JOHNSON arranged for CS-3 to meet with KELLOGG on May 22, 2018, at a park in Dixmoor, Illinois, to discuss CS-3's departure from Business 1. Specifically, on Thursday, May 17, 2018, at approximately 5:44 p.m., CS-3 received an iMessage communication from JOHNSON, using JOHNSON phone, which stated, "Tuesday." [KELLOGG would meet with CS-3 the following Tuesday, May 22, 2017] CS-3 responded, "Ok where and what time[?]" JOHNSON said, "He'll let me know." On or about May 19, 2018, at approximately 1:02 a.m., JOHNSON, using JOHNSON phone, sent an outgoing iMessage communication to CS-3 that stated, "1:30 at the park in Dixmoor."

97. On or about May 22, 2018, at approximately 1 p.m., CS-3 met with agents, who provided him/her with $3,000 in pre-recorded bills in a white envelope to deliver directly to KELLOGG. Agents then searched CS-3 and his/her vehicle and did not find any other large amounts of cash. CS-3 then departed for his/her meeting with KELLOGG.

98. On or about May 22, 2018, at approximately 1:22 p.m., CS-3 had a consensually recorded meeting with KELLOGG at a park in Dixmoor. During the meeting, CS-3 and KELLOGG discussed CS-3's departure from Business 1 and the steps KELLOGG would take to ensure Individual 4 kept making payments after CS-3's departure. Further, CS-3 gave KELLOGG a $3,000 extortion payment. Specifically, KELLOGG told CS-3 to continue to work at Business 1: "You got to hold on until you got your own . . .and I'm sure you can hold on that long." [KELLOGG

told CS-3 s/he had to keep working at Business 1 until CS-3 started his/her own club.] CS-3 said, "But I can't, I can't get the money together." [CS-3 said s/he was having trouble putting the money together to make regular payments to JOHNSON.] KELLOGG said, "Oh, man." CS-3 said, "I have the money, I brought the money now." [CS-3 said s/he had money with him/her at that moment to make that week's payment.] KELLOGG said, "Yeah, right." CS-3 continued, "And I know that covers [unintelligible] for two weeks, and I figured I'd give [him/her][50] my two weeks and run it out . . . KELLOGG said, "Right, right." CS-3 said, "I mean, I know you said you want, you would talk to [him/her]." KELLOGG stated, "I'll talk to [him/her]." CS-3 continued, "I don't know because right now, the way [s/he]'s got it going, I can't, I can't even do nothing. And I, I don't want to disrespect you and be, I'm doing all the running late this week, and running late and . . . ." KELLOGG said, "No, if, if [s/he's] choking you off, I'll give [him/her], I'll give [him/her]—" CS-3 interjected, "[S/he]'s not only choking me off, [s/he]'s choking me off like, Rod. I'm assuming that [s/he] sold it, you know, [s/he] owns it. Like we have nothing going on over there. Like the business is still coming . . . but I'm saying like, [s/he]'s grabbing the money, [s/he]'s having this guy bring it . . . . [S/he]'s not even giving me money to pay bills." KELLOGG said, "[S/he] can't sell it like that, uh, [s/he] can't sell it like that, they have to come, um, to the City and [s/he] know that! They gotta come to the City [unintelligible] new license . . . new entertainment license . . . [s/he] can't sell her entertainment license like that, without another name on it." CS-3 said, "Well maybe

---

[50]      I believe this is a reference to Individual 4.

[s/he] trying to do a deal where [s/he] still own it, let them slide in there, I don't know."
KELLOGG said, "Well, [s/he] still got to talk. See, and, the only way [s/he] gonna talk
now is because you talking to me, and now I know I have to talk to [him/her]." Later
in the conversation, CS-3 said, "Well, I'm gonna be honest with you. [S/he] told me
six months ago, 'Hey, I don't give a fuck, they can't do nothing to me.'" [CS-3 said
that, six months prior, Individual 4 told CS-3 that s/he was going to refuse to continue
making payments to JOHNSON.] CS-3 continued, "So I, you know, I did it, I made
sure, because I know how business works, I wanted to make sure that everything was
in, together, and I know, while I'm there, I want to be safe." [CS-3 said that, after
Individual 4 told CS-3 that s/he no longer planned to make payments to JOHNSON,
CS-3 continued to make the extortion payments without Individual 4's knowledge,
because CS-3 knew KELLOGG expected to continue receiving the payments and CS-
3 wanted to be "safe."] KELLOGG said, "Right." CS-3 continued, "I don't want to
have nobody coming down and fucking with me." KELLOGG said, "No." CS-3
continued, "I don't want to have [Individual B's last name redacted] running around
and . . . I know how it goes." CS-3 continued, "So now that, that's why I wanna give
you this heads up and say, 'Hey, man, two weeks.' And I'm not gonna stay there
because . . . ." KELLOGG said, "Right, yeah." CS-3 continued, "I know if I'm there
you expect, you expect the stuff [extortion payments]." KELLOGG said, "Right, yeah."
CS-3 continued, "So, I'm being respectful, saying, ok, I'm going to give you this [a
$3,000 payment], I know I'm good for two weeks, I'm going to tell [him/her][51] I'm out

---

[51]     I believe this is a reference to Individual 4.

of there in two weeks. After that, [s/he], that's up to [him/her]." [Once CS-3 left Business 1, it would be Individual 4's responsibility to ensure that extortion payments to KELLOGG continued.] KELLOGG said, "I got you, alright. So you walking away?" CS-3 said, "How else am I supposed to do it? I have to be respectful to you . . . ." KELLOGG said, "I'm gonna hold an audience with [him/her][52], uh, sometime this week, or, by next week, and then I'll let you know." Later in the conversation, KELLOGG said, "Now, maybe [s/he]'s[53] in trouble, who knows." KELLOGG continued, "Now, [CS-3's first name redacted], we're not friends yet, me and you . . . Now, now, the business we going in, with you opening up something else, we gonna get to know one another. We'll probably end up being friends, you understand what I mean?" CS-3 said, "Yes sir." KELLOGG continued, "Then you'll know it all. But it takes time to know it all. [S/he][54] don't know anything because [s/he] hasn't came around!" Later in the conversation, KELLOGG said, "And nobody wants to do anything to [him/her], it's just that my business comes to a complete end, and I have to be sure that my business continues." [KELLOGG and his accomplices did not want to have to interfere with Individual 4's business to compel him/her to continue making extortion payments, but KELLOGG had to do what was necessary to make sure that the payments did not stop.] CS-3 said, "I understand that." KELLOGG said, "And if it don't continue, don't worry—I'll take care of it."

---

[52]     I believe this is a reference to Individual 4.

[53]     I believe this is a reference to Individual 4.

[54]     I believe this is a reference to Individual 4.

99. Later in the conversation, KELLOGG stated, "But yeah, uh, where you got it? In the car? [KELLOGG asked CS-3 where the $3,000 payment was]." CS-3 said, "It's in my pocket." KELLOGG stated, "Oh, in your pocket?" CS-3 said, "I was gonna throw it in your truck [KELLOGG's car]." KELLOGG stated, "No, there's somebody in there, uh, uh . . . ." CS-3 said, "You want me to stick in in the trunk?" KELLOGG stated, "Uh, no, I can put it in my hand, you know, when I shake your hand. It's not a million dollars." According to CS-3, at this point in the meeting, CS-3 handed the envelope containing the $3,000 to KELLOGG, and he accepted it.[55] Shortly thereafter, CS-3 said, "I'm telling you, this [man/woman, a reference to Individual 4] is not like you think [s/he] is. I know, [s/he], [s/he] just acts like a gangster." KELLOGG said, "Well, [s/he]'s [his/her] [father/mother]'s [son/daughter][56]." CS-3 said, "Right." KELLOGG said, "And you know what [s/he][57] was . . . and [his/her] mouth was a hell of a mouth! . . . You know I know!" CS-3 said, "But you know what? You guys tamed [him/her] down too when it had to happen." [According to CS-3, this was a reference to 2008 when the Harvey police repeatedly shut down Business 1 after Individual 1 refused to pay $6,000 per month to Individual A.] KELLOGG said, "Yeah, well." CS-3 said, "Because I was there." KELLOGG said, "Right, right, right." CS-3 said, "All that gangster shit only comes down to so much." KELLOGG said, "That's right."

---

[55] CS-3's video recording device had stopped functioning by this point in the meeting.
[56] I believe this is a reference to Individual 4, who is Individual 1's child.
[57] I believe this is a reference to Individual 1.

100.    After CS-3's meeting with KELLOGG, s/he traveled to a predetermined location and met with agents. During the meeting, CS-3 told agents s/he delivered the $3,000 to KELLOGG. Agents searched CS-3 and his/her vehicle, and did not find the $3,000 that agents had provided to CS-3 earlier that day to deliver to KELLOGG.

## III.    **Conclusion**

101.    Based on the facts set forth above, there is probable cause to believe that from no later than in or around 2012 until at least in or around 2018, KELLOGG, JOHNSON, and others known and unknown conspired and agreed to commit an offense against the United States, that is, to use and cause to be used a facility in interstate commerce with the intent to promote, manage, and carry on, and to facilitate the promotion, management, and carrying on, of an unlawful activity, namely, extortion—specifically, theft (obtaining by threat control over property of the owner), in violation of 720 ILCS 5/16-1(a)(3); and intimidation (without lawful authority, threatening to cause official action with intent to cause another to perform any act), in violation of 720 ILCS 5/12-6—and thereafter, to perform and attempt to perform an act of promotion, management, and carrying on, and facilitation of the promotion, management, and carrying on, of the unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3), all in violation of Title 18, United States Code, Section 371.

FURTHER AFFIANT SAYETH NOT.

*nijika rustagi*

NIJIKA RUSTAGI
*Special Agent*
*Federal Bureau of Investigation*

SUBSCRIBED AND SWORN to
before me on March 1, 2019.

_____
MARIA VALDEZ
*United States Magistrate Judge*